KANSAS CITY SOUTHERN RAILWAY COMPANY v. MILLER.

Opinion delivered March 22, 1915.

1. REMOVAL OF CAUSES—RAILROADS—INJURY TO EMPLOYEE—INTERSTATE TRIP.—Plaintiff was injured while performing his duties for defendant railroad company in Arkansas, while disconnecting a steam line on an interstate train. In an action for damages, *held* it was proper for the trial court to refuse to transfer the cause to the Federal court.

2. COST BOND—NONRESIDENT PLAINTIFF—ATTORNEY AS SURETY.—Where plaintiff is a nonresident of the State, and is required under Kirby's Digest, § § 959-964, to give a bond for costs, it is proper for the court to permit plaintiff's attorney, alone, to become surety on said bond.

3. EVIDENCE—PHYSICIANS—PRIVILEGED COMMUNICATIONS.—A physician is incompetent to testify as to information obtained from a patient whom he was attending in a professional character, and which was obtained in order to enable him to prescribe as a physician. Kirby's Digest, § 3098.

4. EVIDENCE—PRIVILEGED COMMUNICATIONS—WAIVER OF PRIVILEGE.—The privilege granted by the law, which prohibited a physician from testifying as to facts learned in a professional character, is not waived by the plaintiff and patient, where he brings an action for damages for the injury done him by the defendant, and, when plaintiff becomes a witness, details the facts, the treatment of his injury, and the condition resulting from it.

5. MASTER AND SERVANT—RULES—KNOWLEDGE OF SERVANT.—A servant is not bound by the rules of the master which are never brought to his attention.

Appeal from Little River Circuit Court; *Jefferson T. Cowling,* Judge; affirmed.

STATEMENT BY THE COURT.

This is a suit for damages for personal injury to plaintiff's eyes, alleged to have been caused by steam escaping through the negligence of the railway company in permitting the steam line of the train to be charged at the time his duties required him to disconnect the train from the engine and when a defective test valve, or one not in working order, failed to disclose that the pipe was charged.

The answer denied any negligence as charged; all the material allegations in the complaint relative thereto; alleged that it was the inspector's duty to discover the condition of the valve and of the steam line before breaking or disconnecting it, and that if he was injured, it was because of his own carelessness or negligence or on account of the risk assumed in his employment.

It appears from the testimony that C. H. Miller was a car inspector for the railway company located at De Queen, Ark., whose duty required him to cut off the passenger train from the engine and connect it up with another engine for the continuation of the journey on to Texas and Louisiana; that about ten or fifteen minutes was allowed for the inspection of the train coming from the north out of Oklahoma and disconnecting the engine and coupling it to another engine when it was due for departure south. It was the custom for the engineer to cut off the steam from the steam line three or four miles before coming into the station where the engines were changed and the inspection made and the brakeman to open the rear valve that the steam might escape therefrom. The steam line is the pipe or hose running from the engine through the coaches for the purpose of heating them. There is a valve at each end of each coach along this steam line and one at the end thereof on the rear coach. The steam line is disconnected or broken by the

inspector at the joint between the engine and the car by raising and pushing it up. At this joint there is a small valve called a test or tell-tale valve, which upon being pushed in or pushed down should disclose whether there is pressure or steam in the line or pipe.

Appellee was injured upon the breaking or disconnecting of the steam line from the engine by the steam and hot water blowing out and burning and scalding his face, forehead and eyes. He stated that he pressed down or tapped the tell-tale valve and it did not show any steam or pressure, and that he then with the help of the other inspector raised the joint or connection and broke it in the usual way and that the steam escaped and injured him.

He also said that he went to the rear of the train after he was injured and discovered that the rear valve on the steam line was closed, and that no steam would have been in the pipe that could have injured him if it had been turned off and the rear valve opened before coming into the station as it was the duty and custom of the other employees to do.

The conductor testified that at the station above De Queen, five or six miles, he directed the brakeman to signal the engineer to cut the steam off from the valve and to open the rear valve of the line and allow it to escape.

The engineer testified that he did cut the steam off from the line, upon the signal at the station above De Queen as was the custom, and the brakeman said that under the instructions of the conductor he went to the rear end of the train and opened the rear valve on the steam line for the steam to escape.

J. R. Sanders testified that he was a car inspector and his duties were "to cut the engine off, look the train over, put the other train on as quick as possible and they had ten minutes to get the train in and out—all the coaches, to see if it was safe to go out to make the trip." He said further that sometimes the steam line was charged with steam and sometimes blown out; that they

were emptied from the rear end and he had found the steam line charged.

The master mechanic testified that the hose connection was the standard in use on the line of railroad, and there was a valve on the lower end of it for the purpose of allowing condensed steam to escape. It is called also a tell-tale valve. "If it is pushed in, it will disclose whether the steam line is charged by the steam escaping through the opening if there is any steam in it. That rule 162, requires "steam hose must not be uncoupled until the steam has been shut off." It was the inspector's duty to see that the steam was shut off and all instructions to all employees having any duty to perform in uncoupling the steam hose is to see that the steam is shut off before the hose is uncoupled. The only test of that is through that valve. It was the duty of the inspector to look for defects and discover if any are in the valve and if the hose are found defective it is his duty to change it or put another on, that is what they are hired for."

The district foreman stated it was the duty of Miller to uncouple the air hose and steam heat or line hose and to satisfy himself of their condition before uncoupling them and that he was an experienced man.

The other inspector, Becker, who was assisting in uncoupling the hose, stated there was a good deal of steam, that he could not tell which way the pressure of the steam came from, he was holding the same piece of hose that Miller was, did not get burned in any way and "I think Miller said shut off the steam. I did not know Miller was hurt until I went around the train. I suppose he stayed there to couple on the other engine. We just raised up the hose and broke it and I was not burned in any way."

Nolen Wells testified he was present when the injury occurred; that appellee was on the east side with another man on the opposite side; that he was on the west side. Miller broke the steam hose and a little bit of steam came out from the engine and very little from

the line of the train. ''When that steam came out he did not make any statement or claim that it burned him, he just said it looked like the steam had not been cut off. I saw the steam that came from the engine end of the pipe. If the steam had not been cut off, it would have come out with greater force.''

Miller's statement reporting the occurrence showed that he was disconnecting the steam line between the baggage car and engine to cut the engine off; ''the steam line was full of steam and when I disconnected the hose the steam burned my face and forehead.'' In giving the nature and extent of the injury ''burned face and forehead.''.

Doctor Lanier stated that appellee came to his hospital about April 13, 1914, for treatment, that his eyes were inflamed, he had conjunctivitis. The cornea of the eye had lost its brightness and luster, was dull looking and was inflamed. The iris and ciliary muscles of the left eye were also inflamed. He said that the eye was so injured that it would get worse; that it also impaired the vision of the other eye and it was possible that the left eye would have to be removed.

Doctor Archer, the railroad surgeon, was not permitted to testify about the condition of plaintiff's eyes when he treated him for the injury immediately after the occurrence, nor to state that he did not claim at that time his eyes were injured.

Doctor Mann, a specialist from Texarkana, was not permitted to testify about the condition of appellee's eyes in April, 1914, ascertained from an examination of his eyes at that time with a view to treating him as a physician, the information being obtained in the course of the consultation with him. He would have stated that the examination disclosed no condition that could have resulted from a scald or burn by steam at the time it was claimed the injury occurred and that appellee's eyes were not injured materially nor permanently at all at the time of his examination. After the examination was made with a view to treatment, appellee asked this physician or was told by him that he was the physician

of the railroad company to treat the injured employees and appellee went away and did not return for treatment. He told the physician at the time that he was a hunter and trapper. This physician testified from an examination made on the day of the trial that the left eye was very much inflamed; that the right eye was in a normal condition except some medicine had been used in it that as soon as its effect had disappeared, it would be as good as ever, and under proper treatment the left eye would be a very good one. In his opinion if the left eye had been burned with hot steam on the 22d day of last December, it would not have caused the present condition of the eye.

Doctor Moulton of Fort Smith also examined him and stated there were scars on the skin surface of the upper and lower lids of the left eye as though it had been recently blistered, that the white part of the eye ball was quite red. The cornea was cloudy and "there is quite an area in the center of this cornea from which the outer covering or outer layers had been recently removed." There is a denudation of the surface. The outside layers of this membrane were wanting as though they had been recently destroyed, so recently that there had not been time for these layers to have been replaced with scar tissue. If that injury had been caused on December 22, it would not have been in that condition now." There was no indication of any permanent injury to his right eye.

The train upon which the steam line was being disconnected was an interstate one, having come out of Oklahoma, and was proceeding on down through Arkansas into Texas and Louisiana upon being coupled to another engine. Appellee alleged in his complaint that he was a citizen of Bowie County, Texas.

The court instructed the jury, and from the judgment on the verdict against it, the railroad company prosecutes this appeal.

*June R. Morrell* and *James B. McDonough,* for appellant.

1. The proof shows that this was an interstate train. The engine, however, had ceased its work with that train at the time of the accident. If this is a case under the State statute, and not under the Federal law, the right of removal existed, and the court erred in denying the petition for removal.

Even if brought under the Employer's Liability Act, the cause is removable. The right of removal is a Federal question. 229 U. S. 123.

2. The plaintiff, by reason of his non-residence, was required to give bond for costs. Kirby's Dig., § § 959-964. A cost bond made by the attorneys in the case is not a proper bond, and the court erred in refusing to require other surety.

3. The testimony of Doctor Lanier was certainly inadmissible. His opinion was not based wholly upon a physical examination. It was aided in part at least by what the plaintiff told him. His testimony sets out certain hearsay statements of the plaintiff, and by the admission of such testimony, the plaintiff succeeded in getting self-serving declarations before the jury. 158 S. W. (Ark.) 494, 108 Ark. 387.

4. It was error to exclude the testimony of Doctors Mann and Archer. As to Doctor Mann, the plaintiff himself testified that he did not treat him. He was not plaintiff's physician, and his evidence can not properly be excluded under section 3098, of Kirby's Digest. Having testified himself as to the conversations with Doctor Mann, he waived the privilege; and this is true as to Doctor Archer, plaintiff having testified fully as to the treatment by him. 31 Ark. 684; 98 Ark. 352; 82 S. E. 718; 130 N. W. 372; 131 Pac. 534; 129 Pac. 1048; 141 N. W. 1056; 158 S. W. 733; 132 Pac. 1103, 37 Okla. 575; 123 Pac. 330; 141 Pac. 963; 125 N. W. 621; 71 Atl. 686.

Plaintiff testified that he consulted Doctor Archer, Doctor Mann and Doctor Lanier. When he himself introduced Doctor Lanier as a witness, he thereby broke

the seal of secrecy as to the other two physicians.   125
S. W. 804; 107 Pac. 369; 85 N. E. 969; *Id.* 824; *Id.* 827.

The purpose of the privilege is to protect a patient
from distress and humiliation, not to aid a plaintiff in
the prosecution of a law suit.   4 Wigmore on Ev., § 2389.
See, also, 104 N. Y. 352; 181 Mass. 55; 85 N. Y. S. 847;
10 *Id.* 657; 148 N. Y. 88; 102 Pac. 1000; 98 Pac. 820; 90
N. E. 1014.

*Steel, Lake & Head,* for appellee.

1.   On the question of removal to the Federal court,
this case is ruled by the *Leslie* case.   112 Ark. 305.

2.   Plaintiff being a non-resident, his attorneys were
liable for the costs of the action anyway, hence there was
no impropriety in their becoming sureties on his bond.

3.   Appellant's objection to Doctor Lanier's testi-
mony was not made a ground for new trial, and can not
be considered here.

4.   There is no dispute but that both Doctor Mann
and Doctor Archer obtained their information while ex-
amining appellee for the purpose of treating him.   Their
testimony was properly excluded.   98 Ark. 352; 24 N. E.
86; 21 N. W. 495; 37 N. E. 954; 38 N. E. 871; 53 Mo. App.
39; 3 Parker, Cr. Rep. (N. Y.) 670; 24 Hun. (N. Y.) 443;
9 N. E. 320; 53 Hun. (N. Y.) 637; 46 *Id.* 448; 13 N. E.
872; 24 N. E. 1102; *Id.* 1098; 32 Am. Rep. 362; 21 Ark.
387; 55 N. E. 43; 76 N. E. 242; 13 N. E. 872; 65 N. E.
765; 61 N. E. 1135; 63 N. Y. Sup. 242; 60 *Id.* 551; 74 *Id.*
902; 89 N. W. 520; 92 Pac. 372; 116 N. W. 917; *Id.* 933;
35 App. D. C. 195; 135 N. W. 879; 62 So. 589; 137 N. W.
894; 152 Fed. 365.

KIRBY, J., (after stating the facts).   It is contended
first that the court erred in denying the petition for the
removal of the case to the United States District Court,
it being insisted that the cause of action did not arise un-
der the Employers' Liability Act of Congress.

(1)   The injury occurred in disconnecting the steam
line on a passenger train running from Kansas City, Mo.,
to Port Arthur, Texas, through De Queen, Ark., where
the engines were changed, while the employee was de-

taching the engine from the train in order to couple on another engine for the continuation of the run. The case on this point is ruled by the decision in *Kansas City So. Ry. Co.* v. *Leslie,* 112 Ark. 305, where the question was decided adversely to the contention.

(2)   It is also urged that the court erred in permitting the plaintiff's attorneys to become sureties on the bond for costs and in refusing to require him to give such bond with other security. The plaintiff being a nonresident of the State, was required, under the law, to give bond with sufficient security for the payment of all costs which might accrue in the action, and the attorneys bringing his suit without such bond having been given are by the law made responsible for the payment of all costs of the action until the bond is given. Kirby's Digest, § § 959-964.

The attorneys being made liable for the payment of the costs of suit are bound for the costs before the bond is given, and we see no reason why such attorneys should not be permitted to become sureties upon the cost bond if the clerk is satisfied with their financial responsibility, and there is no prohibition in the statute against their becoming such surety, and no error was committed in refusing to require a bond given with other sureties.

Neither do we think there was any error committed in allowing the witness Sanders to testify that it was necessary for the inspectors to do their work in a hurry since as he also stated the train only stopped at that station for about ten minutes, and the plaintiff alleged in his complaint that the work was required to be done in a hurry because of the shortness of the time in which it could be done. This fact would not have excused the inspector from ascertaining by pressing, or opening the test valve, whether the steam line was charged at the time of disconnecting it, nor appellee's failure to do so, from being negligence, nor was admission of this witness's understanding of it being the duty of the train employees to cut off the steam from the line and open the valve, error under the circumstances, and it could not have been prejudicial in any event since the conductor,

brakeman, and engineer all testified that it was their duty to do this, and that they had done it in this instance.

We do not think the testimony of Doctor Lanier open to the objection that it was based upon hearsay evidence, and the court did not err in the admission of it within the principle announced in *St. Louis, I. M. & S. Ry. Co.* v. *Williams,* 108 Ark. 387, 158 S. W. 494.

(3)  It is strongly urged that the court erred in excluding the testimony of Doctors Mann and Archer, which was most material as it conduced strongly to show that plaintiff's eyes were not injured materially or at all by the escape of the steam from the steam line as alleged, Doctor Archer having examined and treated him immediately after the injury.  The testimony of these witnesses, neither of whom was called by appellee, was excluded under section 3098, Kirby's Digest, by the court, on the ground that the information was obtained from the patient while attending him in a professional character, and necessary to enable them to prescribe as physicians.

(4)  Appellant insists that appellee, by bringing suit for the injury and becoming a witness and detailing the facts, the treatment thereof, and the condition resulting from it, thereby waived the privilege granted to him by the statute, and cites many cases from other jurisdictions in support of his contention.  While there is much reason for holding that the privilege is waived under such conditions, and that in the interest of justice, the truth of the matter should be discovered by the testimony of the physicians, the patient having disclosed and detailed the facts of the injury minutely, and the treatment thereof, our court has taken the other view and held that the privilege is not thereby waived.  *Collins* v. *Mack,* 31 Ark. 684; *M. & N. A. Rd. Co.* v. *Daniels,* 98 Ark. 352.

It is said in the latter case, of the statute, "This enactment was manifestly made for the benefit of the patient. * * * Being enacted for his benefit, the provision was adopted out of reasons of public policy as a privilege accorded solely to the patient, and, like any other privilege, it is one that the patient may waive, * * * in order to obtain the benefit of the physicians' evidence.  When

this privilege is waived as to any particular witness, the opposing side is entitled to. the benefit of the waiver as to such witness. But the benefit of such waiver in behalf of the adversary should not extend further than to the witness who has been called by the patient, or to other physicians who may have been present upon the same occasion to which the witness testifies. By virtue of the statute, the patient alone is given the right to remove the ban of secrecy. * * * The statute affords him this privilege when the testimony of the offered witness does not relate to the same occasion as that from which the patient has removed the seal of secrecy.''

In *Arizona & New Mexico Ry. Co.* v. *Clark,* 35 Supreme C. R. 210, the United States Supreme Court construed a statute of Nebraska which provides that a physician or surgeon can not be examined without the consent of his patient, as to any communication made by the patient with reference to any physical or supposed physical disease or any knowledge obtained by a personal examination of such patient, ''provided, that if a person offer himself as witness and voluntarily testify with reference to such communication, that is to be deemed a consent to the examination of such physician,'' and held that the privilege was not waived by the voluntary testimony of the patient relative to his physical condition at the time of his examination by a physician.

Decisions construing the statutes of other States unlike ours, are of little value as a guide to the meaning of our own statute in which there is no provision relative to the waiver of the privilege, and we adhere to the views announced in *Railway* v. *Daniels, supra,* for the reasons there given and hold that no error was committed in excluding the testimony of these physicians.

Neither do we agree with appellant's contention that Doctor Mann's testimony was admissible, for the reason that he did not in fact make the examination and ascertain the condition of plaintiff's eyes in the capacity of his physician, not having in fact been employed by nor treated him. It is undisputed, however, that appellee went to Doctor Mann and consulted him about his injury and per-

mitted the examination to be made with a view to engaging his professional services, and that the information was necessary to enable him to prescribe as a physician and acquired for that purpose, and the fact that appellee after the examination discovered that the physician was employed by the appellant company to treat its injured employees, and declined to engage him to treat his injuries, would not permit the physician to disclose the information so acquired over the patient's objection.

The instructions given fairly submitted the issues to the jury, and such of appellant's requested instructions as were refused were sufficiently covered by the instructions given, and we do not find that the court erred in the giving or refusing of instructions.

(5)   As to assumption of risk, it was not shown that it was the duty of the inspector to examine the steam line to ascertain whether or not it was charged. It is true, however, that one of appellant's witnesses testified that under the printed rules of the company, such was his duty, but no such printed rule was produced, nor does the testimony show any such rule was ever called to appellee's attention, nor that any verbal instructions to this effect were ever given to appellee, and he could not be bound by rules not brought to his attention. In *Fort Smith Lumber Co.* v. *Shackleford,* 115 Ark. 272, 171 S. W. (Ark.) 99, the court said, quoting syllabus, "It is the duty of the master to make rules for the protection of his servants, and to make these rules known to the servants, and there is no affirmative duty devolving upon the servants to ascertain what the rules are."

The testimony of appellant's servants show that it was the duty of the train crew to cut off the steam and drain the steam line, that it was their custom to do this, and that they attempted to, or did do it, before the train came into De Queen, where the engine was detached, and the injury occurred, and, besides, the appellee testified that he pressed the tell-tale valve, and it did not disclose that the steam line was charged.

Upon the whole case, we do not find any prejudicial error committed, and the judgment is affirmed.