## MYERS v. STATE OF INDIANA.

[No. 23,968.    Filed December 22, 1922.]

1. CRIMINAL LAW.—*Appeal.*—*Weight of Evidence.*—On an appeal from a judgment of conviction, the court cannot weigh the evidence in determining its sufficiency. p. 594.

2. HOMICIDE.— *Self-Defense.*— When a person, being without fault and in a place where he has a right to be, is violently assaulted, he may without retreating repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable. p. 595.

3. CRIMINAL LAW.—*Evidence.*—*Admissibility.*—*Conversation between Third Parties within Hearing of Accused.*—In a prosecution of a wife for the murder of her husband, a showing that on the same evening the homicide was committed, but some time thereafter, a conversation between a police officer and a third party took place in a room adjacent to the one in which defendant, who was nervous and greatly excited, was sitting, that the doors between the two rooms were open and that defendant was about ten or twelve feet distant from the place where the conversation took place, was insufficient to justify the court in permitting the officer to testify to the conversation so as to bind the defendant on the theory of an admission by reason of her failure to deny; and such conversation was no part of the *res gestae,* but was hearsay and therefore inadmissible. p. 597.

4. WITNESSES.—*Competency.*—*Physicians.*—*Communications between Physician and Patient.*—*Common-Law Rule.*—At common law communications between physician and patient while the physician was in attendance upon the patient were not privileged. p. 599.

5. WITNESSES.— *Competency.*— *Statute.*— *Construction.*— *Privileged Communications.*— *Physician and Patient.*— Section 520 Burns 1914, §497 R. S. 1881, providing that physicians, as to matters communicated to them, as such, by patients in the course of their professional business or advice given in such cases, are privileged, except by consent of the patient, being in derogation of the common-law, should not be enlarged by intendment to include as privileged information entirely aside from that necessary to enable the physician or surgeon to act or prescribe. p. 599.

6. WITNESSES. — *Competency.* — *Physicians.* — *Privileged Communications.*—*Statutes.*—Section 520 Burns 1914, §497 R. S. 1881, providing that physicians, as to matters communicated to them, as such, by patients in the course of their professional business or advice given in such cases, are privileged,

except by consent of the patient, includes as privileged not only communications by the patient to his physician, but any other information the physician may obtain from a physical examination of the patient or by observation while in the discharge of his professional duty or knowledge gained through the intervention of a third party with a view to intelligent treatment. p. 599.

7. WITNESSES. — *Competency.* — *Physicians.* — *Privileged Communications.*— *Statutes.*— In a prosecution for murder, defended on the ground of self-defense, evidence by a physician who had treated deceased that he on one occasion, when leaving the dwelling occupied by deceased, overheard him make threats against defendant's life, was not privileged under §520 Burns 1914, §497 R. S. 1881. p. 600.

From Marion Criminal Court (51,532) ; *James A. Collins,* Judge.

Prosecution by the State of Indiana against Inda Myers. From a judgment of conviction, the defendant appeals. *Reversed.*

*Frank A. Symmes, Frank S. Roby* and *Garth B. Nelson,* for appellant.

*U. S. Lesh,* Attorney-General, and *Mrs. Edward Franklin White,* for the state.

MYERS, J.—Appellant, by indictment, was charged with the crime of murder, §2235 Burns 1914, Acts 1905 p. 584, §347. She was tried by a jury and convicted of manslaughter. From a judgment that she be imprisoned in the Indiana Women's Prison for a term of not less than two years nor more than twenty-one years, she prosecuted this appeal, assigning as error the overruling of her motion for a new trial. The causes assigned and properly presented as reasons for a new trial are, that the verdict of the jury was not sustained by sufficient evidence and was contrary to law; error of the court in admitting certain testimony offered by the state, and in refusing to admit certain testimony offered by appellant. The questions which we will consider were

saved by proper objections and exceptions. The homicide occurred December 4, 1920. The trial was had February 9 and 10, 1921. The plea of self-defense was the sole issue tried.

The first two causes in support of the motion for a new trial rely upon insufficient evidence to sustain the verdict. We have carefully examined the evidence, especially that pertaining to appellant's claim of self-defense. In that respect the evidence before us so strongly supports her contention that if we were permitted to weigh and pass upon it, we would not hesitate to say that it was sufficient to raise a reasonable doubt which would justify an acquittal of the accused. *Trogdon* v. *State* (1892), 133 Ind. 1, 32 N. E. 725; *Plummer* v. *State* (1893), 135 Ind. 308, 34 N. E. 968; *Clark* v. *State* (1902), 159 Ind. 60, 65, 64 N. E. 589. But we cannot weigh the evidence nor say what inferences the jury might reasonably draw from the evidence or circumstances pertaining to her possession of a deadly weapon, or her action in remaining in the room with a person whom she knew to be a dangerous character without sooner attempting to depart, and when she reasonably might have expected trouble with him. These and any other surroundings bearing upon the necessity or apparent necessity, as well as the amount of force necessary to employ to resist an attack, can only be determined from the standpoint of the appellant at the time and under all the existing circumstances, and were all proper matters for the jury alone to consider and weigh in determining whether or not she committed the homicide in the reasonable exercise of the right of self-defense, and its conclusion thereon the record before us will not allow us to disturb. *King* v. *State* (1918), 187 Ind. 220, 118 N. E. 809; *Ellis* v. *State* (1898), 152 Ind. 326, 52 N. E. 82.

In this state, the law of self-defense, as deduced from

modern authorities, is, "that, when a person, being without fault, and in a place where he has a right to be, is violently assaulted, he may, without retreating, repel force by force, and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable." *Runyan* v. *State* (1887), 57 Ind. 80, 84, 26 Am. Rep. 52; *Smith* v. *State* (1895), 142 Ind. 288, 41 N. E. 595.

On the evening of the homicide, it will not be claimed that appellant was in a place where she had no right to be, and there is no evidence that she brought on the controversy which ended in the fatality.

A few facts and some of appellant's undisputed testimony pertaining to the homicide may be instructive. The accused and her adversary were husband and wife and both were engaged in the business of photography. Their studio was in an upstairs room of their dwelling. The homicide took place in this room. In October before the homicide, she commenced an action for a divorce and the papers in that proceeding were, on the evening of the homicide, in the hands of her husband. After the evening meal, of which her husband ate a small portion, he went up to the studio. Later she followed to finish some work she had left in the dark room. On coming out of the dark room she noticed her husband had a knife in his hand and was just finishing eating an apple. He called her to his desk, where he was sitting, and read to her portions of the complaint which she had filed, and demanded that certain statements included therein should be stricken out, because proof of some of them she proposed to make by using his son by a former marriage as a witness; that he would not have his own flesh and blood go upon the stand against him, and, unless she consented to the elimination of certain allegations of the complaint, he said, "you will never live to get a divorce if you go ahead with it." In her

complaint she asked for the two children, his by a former marriage, to which he also objected. She refused to comply with his request and told him to see her attorney. He said he would not see her attorney and it was going to be settled right here and now. He threw down the papers in the divorce proceedings, jumped up, threw back the chair and started toward appellant with an open knife in his hand, using profane, vile and abusive language toward her, with the threat, "I will kill you." As he came toward her she stepped back until she was against a cabinet in the room and told him to stop, not to come any closer, but he continued, both hands up, knife in one hand, and she fired the first shot and started for the stairway, but on finding she could not reach it without coming into contact with him, she fired the second shot, when he stopped and she ran downstairs. A little later she went back up-stairs and saw him lying on the floor, then down again, and to the home of a neighbor and told what she had done and asked that they call the police. Certain officers came, went into the room where her husband was lying dead, and looked over the room, but failed to discover the knife, the apple peelings, or any disarrangement of the furniture in the room, while a number of other disinterested witnesses who followed the officers into the room found the apple peelings in the waste basket, a turned over chair, and the knife described by appellant. There was much undisputed testimony from other witnesses to the effect that they had heard her adversary threaten to take her life, and that his character for peace and quietude was bad, some of whom had communicated these threats to appellant. There was also undisputed testimony that appellant's reputation for peace and quietude was good. From appellant's testimony, corroborated by others, including her step-children, it appears that during their married life he had frequently

committed an assault and battery upon her, cursed, villi-
fied and threatened to kill her.

This evidence may also serve to illustrate the probable
importance of erroneously admitted or erroneously re-
fused testimony, bearing upon the question whether or
not the rulings of the trial court in these matters may
or may not have been harmful to the accused.

The court admitted certain evidence over appellant's
objection, and refused to strike it out. The state, as a
part of its original case, offered and was permit-
3. ted to prove by a police officer, a conversation
he had with another witness who, at the time of
the tragedy, was in a downstairs room of the Myers
home, and was supposed to relate what she heard and
saw, as also that which she did not hear and see. This
conversation took place the same evening at a neigh-
bor's home, but some time after the homicide. It was
not offered as impeaching testimony, but was admitted
on the theory that accused's silence regarding declara-
tions made in her presence must be regarded as admis-
sions. This conversation took place in a room adjacent
to one in which appellant was sitting. She was nervous
and greatly excited, and some witnesses testified that
she was crying and hysterical. The door between the
two rooms was open and appellant was about ten or
twelve feet distant from the place where the conversa-
tion took place. This preliminary showing was not suf-
ficient to justify the court in permitting the officer to
testify to a conversation he had with a third party, and
to thus bind the accused on the theory of an admission.
The witness related a narrative of a past transaction
given him by a third party. It was no part of the *res
gestae* and therefore must be regarded as hearsay, and
therefore inadmissible.

Dr. G. F. Lee, a witness called by appellant, was
asked to state what he heard the deceased say on a cer-

tain occasion when he was leaving a room of the dwelling occupied by the deceased at a time when he was ill. The offer to prove was "I will get her yet, damn her; I will get her yet." This evidence was excluded, on the ground, as stated by the court, that "the doctor was there in the capacity of a physician and what transpired there was all in the scope of his professional employment."

Prior to the question calling for the excluded testimony, the witness testified that he was the family physician of Myers and was called to the Myers home to attend Mrs. Myers (appellant) whom he found very nervous, with ecchymosis covering a large area of her back, and suffering pain in that part of her body. This condition confined her in bed for several days. From other testimony it appears that this call was made in the fall of 1919. In November before the homicide the witness was called to the Myers home on account of the sudden illness of Mr. Myers.

Q. "On that occasion, when you started to go home, did you hear him making any threats or any statement against her life?" A. "Yes." Q. "State to the jury what he said about taking her life, threatening to take her life." A. "I went in the room where he was, and I talked to him a little bit, and came out of that room, which opened into another room, and a door opening into the hallway that led to the upstairs, a door that came out on the porch. When I came out of the room, the front room, I opened the door going into the hallway that led up the stairway, and I closed the door; I opened that door and closed the outside door, and of course he supposed that I had left. I stopped there in the stairway." At this point the witness was stopped by the state, and in answer to questions put to him by the prosecuting attorney, it appears that he went there in the capacity of

attending physician.   The objection then interposed was that "anything he learned there was on account of his confidential relation."   Neither this witness nor did any other witness testify to the statements thus proposed to be proved.

At common law, communications between physician and patient, while the physician was in attendance upon his patient, were not privileged.   *Towles* v. *Mc-Curdy* (1904), 163 Ind. 12, 71 N. E. 129; *Wm. Laurie Co.* v. *McCullough* (1910), 174 Ind. 477, 488, 90 N. E. 1014, 92 N.E. 337; *People* v. *Austin* (1909), 199 N. Y. 446, 93 N. E. 57; *People* v. *DeFrance* (1895), 104 Mich. 563, 62 N. W. 709, 28 L. R. A. 139; Wharton, Criminal Evidence §516; Underhill, Criminal Evidence (2d ed.) §179.   However, by statute, §520 Burns 1914, §497 R. S. 1881, "physicians, as to matters communicated to them, as such, by patients, in the course of their professional business, or advice given in such cases," are privileged, except by consent of the patient.   This statute, being in derogation of the common law, under all rules of statutory construction, should not be enlarged by intendment to include as privileged information entirely aside from that "necessary to communicate to enable the physician or surgeon to act or prescribe."   Underhill, Criminal Evidence (2d ed.) §179.   Nor does it assume to do so merely because the relation of physician and patient exists.

Without stopping to discuss when and under what circumstances communications of a patient to his physician may or may not be privileged, it is sufficient at this time, and for the purposes of this case, to say, that, contrary to the strict rules for construing statutes, the one in question has been somewhat broadened to include as privileged, not only communications by the patient to his physician, but any other information the physician may obtain from a physical

examination of the patient, or by observation while in
the discharge of his professional duty, or knowledge
gained through the intervention of a third party, with
a view to intelligent treatment.   *Cincinnati, etc., R. Co.*
v. *Gross* (1917), 186 Ind. 471, 114 N. E. 962; *New York,*
*etc., R. Co.* v. *Shields* (1916), 185 Ind. 704, 112 N. E.
762; *Towles* v. *McCurdy, supra; Springer, by Next*
*Friend,* v. *Byram* (1894), 137 Ind. 15, 36 N. E. 361, 23
L. R. A. 244, 45 Am. St. 159; *Gurley* v. *Park*
(1893), 135 Ind. 440, 35 N. E. 279; *Heuston* v. *Simpson*
(1888), 115 Ind. 62, 17 N. E. 261, 7 Am. St. 409; *North*
*American Union* v. *Oleske* (1917), 64 Ind. App. 435, 116
N. E. 68; *Hays* v. *Hays* (1912), 49 Ind. App. 298, 97 N.
E. 198; *Slater* v. *Sorge* (1911), 166 Mich. 173, 131 N.
W. 565; *Steketee* v. *Newkirk* (1912), 173 Mich. 222, 138
N. W. 1034; *Collins* v. *Mack* (1887), 31 Ark. 684;
*Kansas City, etc., R. Co.* v. *Miller* (1915), 117
Ark. 396, 175 S. W. 1164; *Feeney* v. *Long Island R. Co.*
(1889), 116 N. Y. 375, 22 N. E. 402, 5 L. R. A. 544;
*Hoyt* v. *Hoyt* (1889), 112 N. Y. 493, 515, 20 N. E. 402.

According to the decisions last cited, the words "mat-
ters communicated," as used in the statute to cover priv-
ileged information, may be defined as information ob-
tained in the sick room, heard or observed by the physi-
cian, or of which he is otherwise informed pertaining
to the patient and upon which he is persuaded to do
some act or give some direction or advice in the dis-
charge of his professional obligation.

Looking to the evidence in the instant case most fa-
vorable to the state, it appears that the witness, on the
occasion of the alleged statements, was called
7. professionally to attend Frederick Myers.   After
examining and treating the patient he departed
from the sick room and left the home of the patient,
but while making his departure and while in the hall or
room adjoining the sick room he heard the patient use

the language which was excluded by the court.    Under this state of the evidence it cannot reasonably be claimed that the statements proposed to be proved by the witness tended to reveal that which should be kept inviolate, nor were they such as would enable him to give advice, treat or prescribe for the patient, nor can it be said that they were made to or that they were intended for him.    The question of privilege, under this showing, did not depend upon inferences to be drawn from testimony.    It was not therefore a question of fact but one of law.    Competency to testify and competency of evidence are questions for the court with the recurring thought that incompetency is the exception.    With these general principles in mind, we are clearly of the opinion that the statute (§520 Burns 1914, *supra*) should not be extended to cover as privileged the excluded testimony, although we have expressions in the books seemingly broadening the literal meaning of the words thus employed.

The general rule governing privileged communications between attorneys and client is applicable to physician and patient.    *Springer, by Next Friend,* v. *Byram, supra; Masonic, etc., Ass'n.* v. *Beck* (1881), 77 Ind. 203, 210, 40 Am. Rep. 295.

With respect to this rule, this court, in *McDonald* v. *McDonald* (1895), 142 Ind. 55, 78, 41 N. E. 336, 344, said:    "To come under the protection of the rule, in question, the communications claimed to be privileged must be addressed to an attorney in his professional character of a legal adviser, with a view to legal advice which as an attorney it was his duty to give."    And again, in *Bower* v. *Bower* (1895), 142 Ind. 194, 202, 41 N. E. 523, 524, it was held that, "While it is true that the rule which forbids a physician to disclose in evidence, matters communicated to him in the course of his profession, is a salutary one, nevertheless it cannot

be extended beyond its evident letter and spirit." See, also, *Miller* v. *Miller* (1911), 47 Ind. App. 239, 247, 94 N. E. 243; *Seifert* v. *State* (1903), 160 Ind. 464, 67 N. E. 100, 98 Am. St. 340; *Haughton* v. *Aetna Life Ins. Co.* (1905), 165 Ind. 32, 73 N. E. 592, 74 N. E. 613. The offered evidence should have been admitted.

Questions of a similar character are discussed in the briefs, but as they will not likely arise on a retrial, we do not consider them.

For the errors pointed out, the judgment is reversed, with instructions that the trial court grant appellant a new trial.