VAUGHAN ET AL. *v.* MARTIN ET AL.

[No. 268A14. Filed October 15, 1969. No petitions for rehearing or transfer filed.]

*Schultz, Ewan & Burns,* Lafayette, and *Cowger & Vaughan* and *Glenn R. Slenker, Sr.,* both of Monticello, for appellants.

*Charles S. Sifered* and *John M. Guy, of Monticello,* and *Lynn O'Neill,* of Logansport, *Cable Ball,* of Lafayette, and *Albert W. Ewbank,* of Indianapolis, for appellees.

HOFFMAN, J.—This appeal arose pursuant to a judgment adverse to appellants (defendants below), on the question of the mental competency of James A. McIntosh, deceased, to execute his last will and testament. The jury, by its verdict, found the pretended will was invalid and its probate should be set aside. Prior to submission the court had instructed the jury that, as a matter of law, there was no evidence that the pretended will was procured by undue influence, nor was there evidence that it was unduly executed.

Appellants' motion for new trial was overruled by the trial court, and this appeal followed.

The record before us discloses the following:

James McIntosh, deceased, was a life-long farmer. He graduated from Purdue University in the early part of this cen-

tury. After the death of his wife, the decedent lived alone as a boarder with a couple in Brookston, Indiana, for the twelve years immediately preceding his death. He owned his own farm consisting of 152 acres which he share-cropped with the Robinson Brothers of Brookston. There was testimony to the effect that decedent was a shrewd businessman and, according to the testimony of one of the Robinson brothers, always made a profit in the operation of his farm.

The decedent made a practice of visiting the farm regularly, tending to all of his own business affairs and caring for his own personal needs without the aid of others.

In the fall of 1961, decedent suffered a virus infection and his activities were somewhat curtailed. Since he practiced the Christian Science faith, he refused medical aid during this illness. During this period, however, the decedent continued to clothe and bathe himself, and also continued walking to a nearby restaurant to take his meals. The facts adduced at the trial showed that until the day before he entered a nursing home, the deceased had continued to carry out these functions.

In mid-February the decedent visited an attorney to see about writing a will. On February 20, 1962, decedent executed his last will and testament.

On March 23, 1962, at his own request, decedent was placed in a nursing home. On being informed of the need for a doctor's approval in order to be admitted to the Home, decedent requested that a particular doctor be called to satisfy this requirement.

After being placed in the Home, decedent survived little more than a month, during which time his health failed rapidly. Because of his religious beliefs, he received no medication or medical attention beyond the minimal amount provided by the Home during his last illness.

Decedent is survived by appellees in this action, all being first cousins by blood relation. His will provided that his estate be paid out in a series of charitable bequests to the

First Church of Christ Scientist, Christian Science Students Association, and Post No. 251 of the American Legion, with an additional bequest to the named executor in the will. Also, there were bequests of $500 to each of decedent's cousins named in said will.

Testimony most favorable to appellees further tended to prove that decedent suffered and died from a severe case of arteriosclerosis. In addition to the doctor who examined the decedent for admittance to the Home, two medical experts testified at the trial, neither of whom had ever seen the decedent before or after his death and based their opinions on hypothetical questions.

Joseph Bazler, the executor under the will, died after the commencement of this action. Suggestion of death was submitted to the court, however, there was no substitution of parties. Appellants assert this failure to substitute was reversible error and constitutes appellants' Point One of argument. Point One encompasses Specifications Nos. 2, 3, 4, 5 and 6 of appellants' motion for new trial.

Appellants assign as Point Two of argument that it was error for the court to fail to withdraw the issues of "invalid execution" and "execution procured by fraud and duress," from consideration by the jury at the end of the plaintiffs' evidence in chief. Point Two encompasses Specifications Nos. 8 and 9 of the motion for new trial. We note, however, that such issues were, in fact, withdrawn prior to submission.

Point Three of argument assigned by appellants relates to the exclusion of evidence submitted by appellants (defendants below) on the existence of a physician-patient relationship which would have made testimony by Dr. Derhammer[1] incompetent. Point Three of argument is based on Specifications Nos. 10(a), 10(b), 10(c) of the motion for new trial.

Point Four of argument asserts that the court erred in over-ruling objections made to the competency of Dr. Derhammer

---

[1] Dr. Derhammer was the physician who examined the decedent.

to testify to privileged communications. Point Four encompasses Specification No. 10(e) of appellants' motion for new trial.

Point Five of argument relates generally to several objections made by appellees during cross-examination of Dr. Derhammer by appellants—all of which were sustained. Appellants assert that the questions excluded by these objections were material and beneficial to them. All of the questions directed to Dr. Derhammer were related to the soundness of mind of the decedent. Point Five encompasses Specifications Nos. 10(f), 10(g), 10(h), 10(i), and 10(j) of appellants' motion for new trial.

Point Six of argument again alleges that the court erred in sustaining objections to questions asked two witnesses, Frank and Lena Gunthrop, the landlords of the decedent. The questions asked of them again related to the soundness of mind of decedent. Point Six encompasses Specifications Nos. 10(k), 10($l$), 10(n) and 10(o) of appellants' motion for new trial.

Point Seven of argument relates to an objection made and overruled to the admittance of a "Physician's Sheet"—a form filled out by Dr. Derhammer for purposes of admitting decedent to the nursing home. Appellants challenge this ruling alleging that this evidence was 1) hearsay, and 2) was a product of the physician-patient relationship and, therefore, privileged. This point encompasses Specification No. 10(m) of appellants' motion for new trial.

Appellants contend that the judgment of the trial court should be set aside and this case remanded for a new trial.

Our decision makes it unnecessary to discuss any of the points of argument except the specification of error assigned in Point Four of the argument.

For the reasons hereinafter stated, we hold the evidence admitted at the trial concerning decedent's physical condition by Dr. Derhammer was improperly admitted as a product of

the physician-patient relationship and the result was prejudicial error.

Acts 1881 (Spec. Sess.), ch. 38, § 275, p. 240, § 2-1714, Burns' 1968 Repl., has established, by statute, the rule of evidence pertaining to the incompetency of certain persons to testify as to particular matters:

> "The following persons shall not be competent witnesses:
>
> \* \* \* \* \*
>
> "Fourth. Physicians, as to matter communicated to them, as such, by patients, in the course of their professional business, or advice given in such cases."

The issue presented here is whether or not the decedent and Dr. Derhammer were in a patient-physician relationship.

The operative facts are not in dispute. Dr. Derhammer had known the decedent for many years. He had not, however, given medical treatment to the decedent for over 25 years—essentially, the period during which the decedent adhered to the Christian Science faith up until his death.

The decedent apparently was aware of his failing physical condition and made preliminary arrangements to enter the nursing home. According to the testimony of Gwin Robinson, the decedent requested him to see about placing him in the nursing home. After it was discovered that a physician's permission was necessary for admittance, the decedent requested that Mr. Robinson call Dr. Derhammer for him to make an appointment. Arrangements were made and the doctor called on the decedent. He was informed by the decedent that he would be paid by Mr. Bazler. He was, in fact, paid by Mr. Bazler.

During the trial, counsel for appellants interrupted the direct examination of Dr. Derhammer in order to ask questions preliminary to an objection on the grounds of the existence of a physician-patient relationship. Such preliminary questions established the following:

1. That he was called at the request of decedent;

2. That he attended the decedent in the course of his professional business as a physician;

3. That he conducted an examination of the decedent by observation and by conversing with him;

4. That he made an evaluation of the decedent's condition and made a determination that he should be placed in a nursing home;

5. That he signed admission papers in order to obtain admission into a nursing home for the decedent;

6. That he was paid by the decedent.

Over appellants' objections following the preliminary questions, the court permitted Dr. Derhammer to testify as to the decedent's physical and mental condition. There was no express or implied waiver of the physician-patient privilege rule by the personal representative of the estate.

It should be noted at this point that any questions propounded preliminary to an objection to testimony on the basis of physician-patient privilege which illuminate the number of contacts and the purpose of the contacts should be permitted. Such questions, while not necessarily controlling, assist the court in its determination.

Appellees have argued that the rule does not contemplate the situation which occurred here. They suggest that although Dr. Derhammer was acting in his professional capacity, he was *not* in a physician-patient relationship. They argue that a physician-patient relationship requires a more intimate contact and that where, as here, the doctor was simply providing a utilitarian service as distinguished from the traditional diagnosis and treatment function, such a relationship did not exist.

Our Supreme Court has said,

"[T]he purpose [of the statute] is the promotion and protection of confidence of a certain kind, the inviolability of which is deemed of more importance than the results sought through compulsory disclosure in a court of justice." *The*

*Penn Mutual Life Ins. Co.* v. *Wiler,* 100 Ind. 92, at page 100, 50 Am. Rep. 769 (1885). See also: *Stayner* v. *Nye,* 227 Ind. 231, 237, 85 N. E. 2d 496 (1949).

The statute (§ 2-1714 (Fourth) *supra*), includes the following prerequisites to a determination of incompetent testimony based on the patient-physician relationship:

The physician shall not be competent to testify about 1) "matter" "communicated" to the physician by the patient when 2) the "matter" is "communicated" "in the course of" his "professional business"; or, 3) "advice" is "given" by the physician to the patient.

In *Myers* v. *State,* 192 Ind. 592, at page 600, 137 N. E. 547 (1922), our Supreme Court defined the phrase, "matters communicated", as follows:

"According to the decisions last cited, the words 'matters communicated,' as used in the statute to cover privileged information, may be defined as *information obtained in the sick room, heard or observed by the physician,* or of which he is otherwise informed pertaining to the patient and *upon which he is persuaded to do some act* or give some direction or advice in the discharge of his professional obligation." (Emphasis supplied.)

As hereinabove stated, the critical determination here is relative to the specific relationship required by Point Four above. "Professional business" means any contact between a doctor and a person—a patient—in the course of which the doctor is required to make some evaluation, perform such duty, or do some act based upon his medical expertise which is to benefit the patient. The resolution of this requirement is made on a qualitative basis rather than a quantitative basis.

Implicit in this definition is the idea or the concept that the relationship between a doctor and a patient is a personal relationship. The contact is for the direct benefit of the patient and not for a third party. We thus distinguish this case from those cases wherein an examination is

.conducted for the benefit of a third party.[2] In those cases no privilege exists. We believe this distinction to be in line with the public policy set out in *The Penn Mutual Life Ins. Co. v. Wiler, supra.*

The further distinction urged upon us by appellees is without merit. Dr. Derhammer's efforts were for the direct benefit of his patient. He was called at the request of the decedent, examined him in his professional capacity, and was paid by the decedent for his services.

In the instant case, Dr. Derhammer was called to perform a duty which required a medical doctor. "Matters" were "communicated" to him within the definition heretofore set out. Furthermore, he was working for the direct benefit of his patient, the decedent. He was, therefore, incompetent to testify as to those "matters."

Because of the manifest error in admitting into evidence, over the timely objections of the appellants, the testimony of Dr. Derhammer regarding privileged communications, the decision of the trial court is reversed and this cause is remanded for proceedings consistent with this opinion.

Judgment reversed and cause remanded. Costs taxed against appellees.

Pfaff, C.J., Sharp and White, JJ., concur.

NOTE.—Reported in 251 N. E. 2d 444.

---

2. See: *Chicago, etc. R. Co. v. Gorman,* 47 Ind. App. 432, 94 N. E. 730 (1911); *Pennsylvania R. Co. v. Hough,* 88 Ind. App. 601, 161 N. E. 705 (Transfer denied), (1929).