## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### NELSON v. COMMONWEALTH.

#### November 12, 1925.

1. EVIDENCE—*Objections to Question Put Witness—Expected Answer—Answer Manifest.*—In a prosecution for involuntary homicide the witness was asked if he has not heard of other people being suspected in the case, which he answered in the affirmative. He was then asked who else had. he heard named. 'It was manifest that the witness would have named one or more persons.

   *Held:* That this was not a case to which the rule applies that the anticipated answer of the witness must. be given, or else the objection to the testimony will not be considered.

2. HOMICIDE—*Involuntary Homicide—Objection to Testimony as to other Persons Suspected—Evidence Excluded afterwards Admitted without Objection—Case at Bar.*—In the instant case, a prosecution for involuntary homicide, the witness had been asked if he had not heard of other persons being suspected and answered in the affirmative. He was then asked to name the suspects. The Commonwealth objected and its objection was sustained. There was no evidence of any animosity towards the deceased on the part of any one, nor was it claimed that the killing was intentional. All that could be expected of the witness was the names of those who were suspected of probably being connected with the shooting.

   *Held:* That the trial court committed no error in excluding the testimony, as it would not have been of any particular benefit to the defendant, and even if error was committed in excluding it would have been harmless because all of the evidence on that subject was subsequently introduced without objection.

3. CRIMINAL LAW—*Evidence—Statements of Accused made at the Preliminary Examination.*—In a prosecution for involuntary homicide the action of the trial court in allowing a witness for the Commonwealth to testify as to the statements made by the defendant at the preliminary hearing of the case was assigned as error. Prior to the cross-examination of the witness, there was nothing to indicate that the defendant had not voluntarily testified in his own behalf, but as soon as it was discovered that he had not so testified, this evidence was immediately stricken out. Under these circumstances, the testimony of the witness could not have been prejudicial to the defendant. It had been stricken out, and there was nothing else the trial court could do.

4. HOMICIDE—*Involuntary Homicide—View of Automobile—Evidence that Automobile had been Tampered with Prior to View—Case at Bar.*—In the instant case, a prosecution for involuntary homicide, by consent of both parties a view was had of the automobile in which deceased was riding when shot. After the view a witness testified that he had examined the bullet hole in the back of the car on the morning after the shooting, and that the bullet which went through that hole could not have killed the deceased, as the range of it was in a different direction, and that since his examination this hole had been punched so that the hole was not in the same condition as when examined by him on the morning after the shooting. Defendant moved the court to exclude all evidence secured by the experiment or impressions gained by the jurors. This the court refused to do.

   *Held:* That the defendant could not have been prejudiced by the ruling of the court.

5. HOMICIDE—*Involuntary Homicide—Instructions—Motive.*—In a prosecution for involuntary homicide the defendant asked the court to instruct the jury that "the absence of all evidence of an inducing cause or motive to commit the crime, when the fact is in reasonable doubt as to who committed it, affords a strong presumption of innocence." The court amended the instruction by adding the words "but the jury may convict of involuntary manslaughter without proof of inducing motive."

   *Held:* That it would have been improper to have given the instruction as offered by the accused and it would have been misleading if the court had not made the addition to it.

6. HOMICIDE—*Involuntary Homicide—Motive—Presumption of Innocence.*— Where an act is charged to have been involuntary, the absence of any motive to commit it raises no presumption of innocence and is wholly irrelevant.

7. *Homicide—Involuntary Homicide—Instructions for Commonwealth—Case at Bar.*—In the instant case the court, in an instruction asked for by the Commonwealth, after defining involuntary manslaughter, told the jury if they believed that defendant shot off a pistol (which was an unlawful act) without intent of injuring the deceased and without malice towards the deceased, and the deceased was struck and killed by a bullet from the pistol, the jury should find the defendant guilty of involuntary manslaughter. It was objected to this instruction that it unduly emphasized the fact that there was no other solution of the killing of the deceased than that of involuntary manslaughter.

   *Held:* That the court committed no error in granting the instruction.

8. INSTRUCTIONS—*Criminal Law—Defendant's Theory of the Case.*—In a criminal prosecution, where the theory of the case for the Commonwealth has been set forth in the instructions, the accused is also entitled to have his theory presented.

9. HOMICIDE—*Involuntary Homicide—Instructions—Court's Opinion Upon the Testimony.*—In a prosecution for involuntary homicide, the accused asked for an instruction embodying his view of the case, and that if the jury believed the facts stated in the instruction, then the bullet from the pistol of defendant could not have killed deceased and that then there was no evidence upon which to convict the accused. This instruction was refused. There was evidence before the jury to support every hypothetical statement made in the instruction but the instruction concluded with an erroneous statement of the court's opinion upon the testimony. Strictly speaking, it was wrong to say as a matter of law that there was no evidence upon which to convict the accused, but upon the case stated in the instruction there was no reasonable probability that the shot so directed would have hit the deceased, though there was a remote possibility that it might.

10. HOMICIDE—*Involuntary Homicide—Instructions—Duty of Court to Amend—Defendant's View of the Case—Case at Bar.*—In the instant case, a prosecution for involuntary homicide, the defendant was entitled to have his views of the case presented to the jury by a proper instruction tendered for that purpose. The case stated in the instruction, asked for by him, was supported by the evidence and the only error in it was in the conclusion which gave the opinion of the court upon the evidence. This was error, but the point was a vital one to the defendant, setting forth his view, that from the evidence there was no reasonable probability that the shots from his pistol could have hit deceased, and it was not sufficient for the court simply to have refused the instruction instead of correcting it and giving it in proper form. While as a rule the trial court is not bound to correct or amend an erroneous instruction, yet under the facts of this case it was error to have refused to instruct on this materially vital point in the case.

Error to a judgment of the Circuit Court of Nelson county.

*Reversed.*

The opinion states the case.

*Wm. Kinckle Allen,* for the plaintiff in error.

*John R. Saunders, Attorney-General; Leon M. Bazile and Lewis H. Machen, Assistant Attorney-Generals,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

The plaintiff in error, hereinafter called the defendant, was convicted of involuntary manslaughter and sentenced to the penitentiary for four years.

On the night of December 24, 1923, between seven and eight o'clock, Thomas Martin Coleman, a young white man about twenty-one years of age, was driving a Ford automobile along the public highway in Nelson county. He was at the wheel, next to him sat his sister, and next to her, on the same seat, was Rev. Mr. Phillips. There was no one in the back seat. They stopped at Goodwin's store to make some purchases, and after remaining there a short time resumed their journey. It was the night before Christmas, and there was considerable noise at and near the store arising from the discharge of explosives of different kinds, chiefly firecrackers, and some pistol shots. Some of the witnesses could not distinguish the noise of one from that of the other. The car had proceeded but a short distance from the store, when one shot was heard, and, after a short pause, three more in rapid succession, the latter from behind the car. Mr. Phillips thought the first shot was a "pop-cracker." Immediately after the last three shots, Coleman's head dropped to the steering wheel, and when the car was stopped it was found that he had been shot through the head. The ball entered on the left side of the head "a little behind and on a level with the left ear," and ranged upwards and came out "about four inches above the top of the right ear." Coleman died immediately.

The defendant, two of his brothers, and several other colored men were in the Goodwin store when the deceased came in, and the latter bought some cigars and gave one of them to the defendant. The defendant, in company with Andrew Harris and Winborn Pearl, left the store shortly before the deceased and proceeded

down the road in the direction of Afton. They had gone but a short distance, walking along the right side of the road, when the deceased passed in his car on their left, and when he had gotten ten or fifteen yards beyond them, the defendant fired two shots from his pistol into the ground on his right. The statement that he had fired only two shots and that they were to the right and fired into the ground is confirmed by the other two persons who were with him at the time, and who state that neither of those two shots could have struck the deceased or his automobile.

On the morning after the accident three shells were found in the road near the scene of the homicide similar to those used in the defendant's gun, and also a nail, and it was the theory of the Commonwealth that the defendant fired three times instead of two, and that one of these three shots struck the deceased and killed him. It was also the theory of the Commonwealth that the deceased took the first explosion to be a blowout, and turned his head to look back at his rear left wheel, and that one of the three shots fired in rapid succession struck him while his head was in that position. But the testimony of Phillips, who was sitting on the seat with him, was that he at first thought they had a blow-out in the left hind wheel, and so stated to the deceased, but that the latter turned his head towards Phillips, with a sort of smile, and said to him "you are mistaken," and just at that time there were three reports and the deceased dropped his head.

The defendant testified that immediately after firing the two shots from his pistol, he opened his gun and three of the shells dropped out, and that he was unable to get the other two out at that time. His theory was that it was impossible for either of the shots fired by him to have struck the deceased; that not only was

there no evidence that the deceased ever turned his head to look back at his rear wheel, but on the contrary his head was turned towards Phillips at first, and then, according to Phillips' own testimony, so far as he could observe, he looked straight down the road; that the shells were found "near the right hand automobile track," showing that he was on the right side of the road, and that it was impossible from the position occupied by him that the shots fired by him could have struck the deceased.

It also appears from the testimony for the Commonwealth that the defendant was neither drunk nor drinking, and that his reputation for truthfulness and for peace and good order was good.

There are several assignments of error.

[1, 2] It is assigned as error that the trial court erred in refusing to allow a witness for the Commonwealth to answer certain questions propounded by the defendant. A witness was asked if he had not heard of other people being suspected in the case, which he answered in the affirmative. He was then asked: "Who else have you heard named in this case?" and "Who else have you heard named in this case of probably having done this shooting?" Both of which questions were objected to by the Commonwealth, and the objection was sustained.

It is true that the bill of exception does not show specifically what answer the witness would have given, but it is very manifest that he would have named one or more third persons. It afterwards developed in the testimony that six or eight other men were arrested about the same time that the defendant was, and their names were given, but they were all discharged. This is not a case to which the rule applies that the anticipated answer of the witness must be given, or else the

objection to the testimony will not be considered. It is perfectly manifest that the witness would have given the name of one or more third persons; but the most that could have been expected from the witness was that he would give the names of those who were suspected of probably being connected with the shooting. All that was attempted to be elicited by the questions were the names of the person or persons who were suspected of having committed the crime. There was no evidence of any animosity towards the deceased on the part of any one, nor was it claimed that the killing was intentional. The trial court committed no error in excluding this testimony, as it would not have been of any particular benefit to the defendant; and even if error was committed in excluding the answers, it would have been harmless because all of the evidence on that subject was subsequently introduced without objection.

[3] The second assignment of error was to the action of the trial court in allowing a witness for the Commonwealth to testify as to statements made by the defendant at the preliminary hearing of the case. After the witness had testified as to the statement of the defendant, it developed that the statement had been made while the defendant was under oath; not having testified in his own behalf, but having been called by the magistrate. As soon as this developed, the prosecuting attorney said: "If there is any doubt about his testimony, I want the evidence struck out. Strike Mr. Davis' evidence out." To which the court replied: "All right, it has been struck out."

Prior to the cross-examination of the witness, there was nothing to indicate that the defendant had not voluntarily testified in his own behalf, but as soon as it was discovered that he had not so testified, this

evidence was immediately stricken out. Under these circumstances, the testimony of the witness could not have been prejudicial to the defendant. It had been stricken out, and there was nothing else the trial court could do. *Harris* v. *Com'th*, 133 Va. 700, 708-9, 112 S. E. 753; *State* v. *Laycock*, 141 Mo. 274, 42 S. W. 723.

[4] During the examination of a witness for the Commonwealth it was thought desirable to have a view of the automobile in which the deceased was riding at the time of the accident, and a view was had by consent of both parties. Later on, the witness who was testifying at the time as to the automobile was recalled by the defendant, and it was shown by him that he had examined the bullet hole in the back of the car on the morning after the shooting, and that the bullet which went through that hole could not have killed the deceased, as the range of it was in a different direction, and that since his examination the day after the homicide this hole had been punched, with pencils or something of that kind, so that the hole was not in the same condition it was on the morning after the shooting. The defendant thereupon moved the court to exclude all evidence secured by the experiment or illustration at the time of the view, or impression gained by the jurors in dealing with the hole as it then was; but the court overruled the motion.

It is not perceived how the court could have excluded from the jury the impressions which they had gotten from viewing the hole in the car. The view was taken, if not at the request of the defendant, certainly with his approval and consent. No material testimony was given at the view, and there was practically nothing for the court to exclude. The testimony as to change in the condition of the hole, and the reasons for it, was all brought out before the jury, and they

well understood the changed condition. No error was committed in allowing the view in the first instance, and the change in the condition of the hole was fully explained to the jury by the evidence of the witness on that subject. The defendant could not have been prejudiced by the ruling of the trial court.

· The next assignment of error is to the ruling of the trial court on the instructions. Instruction 7, asked for by the defendant, was amended by the court and given in the amended form. The amendment made by the court is indicated by italics. The instruction as amended was as follows:

[5, 6] "The court instructs the jury that the absence of all evidence of an inducing cause or motive to commit the crime, when the fact is in reasonable doubt as to who committed it, affords a strong presumption of innocence. *But the jury may convict of involuntary manslaughter without proof of inducing motive.*"

The instruction, as tendered, stated a mere abstract proposition of law, not applicable to the facts in the case, and might well have been refused on that account. The instruction, as asked, was only applicable to a case where the act was a voluntary act. Where an act is charged to have been involuntary, the absence of any motive to commit it raises no presumption of innocence and is wholly irrelevant. The Commonwealth, by the instruction it asked, admitted that the act complained of and for which conviction was sought was involuntary, and that the highest crime of which the accused could be convicted was involuntary manslaughter. Criminal intent was excluded by admitting the act to have been involuntary. It would have been improper to have given the instruction as offered by the accused, and certainly. it would have been very misleading if the court had not made the addition to it.

In making this addition the court committed no error of which the defendant can complain.

It is further assigned as error that the trial court gave instruction A at the instance of the Commonwealth, and refused instruction 8 tendered by the defendant. Instruction A was intended to present the Commonwealth's view of the evidence. Instruction 8 was intended to present the view of the defendant.

[7] Instruction A was as follows: "The court instructs the jury that involuntary manslaughter is the unlawful killing of a human being without malice, either express or implied, and without intent to kill or inflict the injury causing death, committed accidentally in the commission of some unlawful act not felonious. The court, therefore, instructs the jury that if they shall believe from the evidence in this case, beyond a reasonable doubt, that on December 24, 1923, the defendant, Sam Nelson, in or on the side of the public road at or near Nelly's Ford, Nelson county, Virginia, shot off a pistol (which is an unlawful act), without any intent of injuring Thomas Martin Coleman, and without any malice, express or implied, and that the said Thomas Martin Coleman was struck by one of the bullets discharged from the said pistol in the hands of the defendant, Sam Nelson, and that by reason thereof the said Thomas Martin Coleman was killed, then they should find the defendant, Sam Nelson, guilty of involuntary manslaughter, and punish him as set out in another instruction."

The objection to this instruction was that it "unduly emphasized the fact that there was no other solution of the killing of the deceased than that of involuntary manslaughter."

Upon the case stated in instruction A, the conclusion drawn in the instruction is plainly right. We find no

objection to the instruction, and the court committed no error in granting it.

[8, 9, 10] Instruction 8, tendered by the defendant and refused, was as follows: "The court instructs the jury that if they believe from the evidence that at the time that accused shot he was over on the right-hand side of the road between J. O. Goodwin's store and the garage, and shot his pistol twice to his right towards the ground, and that, from the evidence at the time the accused shot [the deceased was at or near the end of the garage and shop, which it is admitted is about seventy-five feet long, and that] the deceased was sitting on the left-hand side of the front seat, at the wheel, driving his Ford car, and it was not discovered until he had gone some distance [and near a tobacco barn, 220 yards from the end of the said garage and shop] that he was shot, and it was then found that he was shot directly above the left ear, the bullet there entering and passing entirely in a straight line and diagonally upward through the skull and was removed on the other or right-hand side of his skull, about four inches above the right ear, that then there is no evidence upon which to convict the accused and they must find him not guilty."

The instruction is unnecessarily long and contains matter of surplusage which might well have been omitted. This surplusage is indicated by brackets. This instruction was intended to present defendant's view of the case. There was evidence before the jury to support every hypothetical statement made in the instruction, and it intended to present to the jury the idea that if they believed the facts stated in the instruction, then the bullet from the pistol of the defendant could not have killed the deceased but, unfortunately, that instruction concludes with an erroneous

statement of the court's opinion upon the testimony. Strictly speaking, it was wrong to say as a matter of law that there was no evidence upon which to convict the accused, but upon the case stated in the instruction there was no reasonable probability that the shot so directed would have hit the deceased, though there was a remote possibility that it might, and such, no doubt, was the intention of the draftsman, and the instruction should have been so modified. Instruction A having set forth the theory of the Commonwealth, the accused was entitled to have his theory also presented. This he attempted to do in his instruction No. 8, which set forth the practical conclusion from the premises stated, but it went too far in stating, as a matter of law binding upon the jury, that there was no evidence upon which to convict the accused. The instruction should have concluded with the direction to find the accused not guilty unless they believed from the evidence that a bullet from the defendant's gun had in fact struck and killed the deceased. Plainly the defendant was entitled to have his views of the case presented to the jury by a proper instruction tendered for that purpose. The case stated in the instruction, as stated, is abundantly supported by evidence introduced in this case, and the only error in it was in the conclusion which gave the opinion of the court upon the evidence, and took away from the jury the question of the weight to be given to the evidence. This was error, but the point was a vital one to the defendant, and it was not sufficient for the court simply to have refused the instruction instead of correcting it and giving it in proper form. While as a rule the trial court is not bound to correct or amend an erroneous instruction, yet under the facts of this case it was error to have refused to instruct on this materially

vital point in the case.  The jury should not have been left wholly in the dark as to what was the law on the subject.  *Browby-Kantor Co.* v. *Levine,* 135 Va. 295, 116 S. E. 677, 32 A. L. R. 249; *Crosby* v. *Commonwealth,* 132 Va. 518, 520, 110 S. E. 270; *Sims* v. *Commonwealth,* 134 Va. 736, 760, 115 S. E. 382; Burks Pleading & Practice (2d ed.), p. 493.

The next assignment of error is because the verdict is contrary to the law and the evidence.  As the case has to be remanded for a new trial, this assignment will not be passed upon.

For the error committed in failing to amend instruction 8, tendered by the defendant, and to give a proper instruction upon the hypothetical case therein stated, the judgment of the trial court must be reversed, the verdict of the jury set aside, and the case remanded for a new trial not inconsistent with the views hereinbefore expressed.

*Reversed.*