STATE OF INDIANA *v.* RONALD OVERMYER.

[No. 3-872A41. Filed April 5, 1973.]

*Theodore L. Sendak,* Attorney General, *Mark Peden,* Deputy Attorney General, for appellant.

*Gerald A. Kamm, Doran, Manion, Boynton & Kamm,* of South Bend, *William L. Morris,* of Rochester, for appellee.

LYBROOK, J.—Defendant-appellee (Overmyer) was charged with being an accessory after the fact, in that he unlawfully

assisted one Porter Rhodes (Rhodes), who had been charged with Theft, to escape from detection, arrest, capture and punishment for the commission of said crime. IC 1971, 35-1-29-3; Ind. Ann. Stat. § 9-103 (Burns 1956).

Jury trial was begun and at the close of the State's evidence the trial court granted a directed verdict for Overmyer. The State appeals.

The sole issue concerns the propriety of the court's action in directing the verdict.

Indiana law concerning directed verdicts is well expressed in *Bash* v. *State* (1970), 254 Ind. 671, 262 N.E.2d 386, wherein our Supreme Court said:

> "A directed verdict is only proper where there is a total absence of evidence on some essential issue required to convict, or where the evidence is without conflict and susceptible to only one inference in favor of the accused. Davis v. State (1968), Ind., 239 N.E. 2d 601; Hardin v. State (1964), 246 Ind. 23, 201 N.E. 2d 333, 202 N.E. 2d 164."

In *Holliday* v. *State* (1970), 254 Ind. 85, 257 N.E.2d 679, in passing on the requirements of a directed verdict, the court said:

> "To avoid a directed verdict the State merely has to make out a prima facie case."

These rules were reiterated in *Nelson* v. *State* (1972), 259 Ind. 339, 287 N.E.2d 336.

In our opinion, the State presented sufficient evidence of probative value which, together with the reasonable inferences to be drawn therefrom, made a prima facie case. To illustrate our reasons for this opinion, a recitation of certain testimony is necessary.

The evidence shows that Overmyer was Chief of Police in the City of Rochester. Porter Rhodes and Dennis Drudge, Rhodes' son-in-law, were police officers in Rochester.

In December of 1970, Bailey's Hardware in Rochester was burglarized. On February 4, 1971, Overmyer called Drudge and told him to bring a picture of Rhodes to the police station but to ". . . hang onto the picture and not let anyone else have it."

At the police station Drudge found out that someone fitting Rhodes' description had attempted to break into a savings and loan association in Rensselaer, that Rhodes had reported his license plate lost or stolen and that the State Police were investigating.

At Overmyer's order, Drudge and Overmyer met Rhodes north of Rochester where Overmyer told Rhodes, " 'Well, we wouldn't be here if you weren't in a hell of a mess' ", to which Rhodes replied, " '[I] figured I was going to get caught eventually.' " Overmyer then told Drudge to pick up Rhodes' car and " 'Bring the car back thru [sic] the back roads so nobody can find it . . . They are looking for it.' "

Drudge brought the car in and searched it pursuant to Overmyer's orders, finding a sack containing a router and belt sander, taken by Rhodes in the Bailey burglary, and a dealer's license plate in the trunk. After Drudge returned to City Hall, Rhodes gave him the keys to Rhodes' car, saying, " 'Get my white stomach pills out of the car and bring them back and get rid of the sack in the trunk.' " Drudge got the sack, put it in a police car and told Overmyer what he had done. Overmyer then spoke with Rhodes privately.

Later, Overmyer and Officers Johnson and Drudge went to a nearby restaurant and viewed the sack.

Still later, State Police Lt. Lohman took Rhodes from the police station. Rhodes, after conferring with Overmyer, finally consented to a search of his car.

Subsequently, Overmyer told Drudge, " 'Dennie, you have to make a phone call—make the phone call some place where it cannot be traced, and call Porter's brother, Bobbie, at Hobart, Indiana, and tell him to get rid of the gun.' " The

gun had also been taken by Rhodes in the Bailey burglary and Rhodes had sold it to his brother.

Drudge, Overmyer and Officer Johnson later discussed what they should do with the router and sander. They considered having Drudge take them to his home to hide them or burying them in Rhodes' basement. Overmyer finally told Drudge to take them to the "river lot" in Rhodes vehicle, to use "evasive action" in getting there so no one could follow him and that if he was followed, to dump the sack in the river.

Drudge hid the router and sander in an old truckbed at the river lot and threw the license plate in the creek. After Drudge returned to Rochester, he called Bobbie Rhodes and told him to get rid of the gun.

Later that morning, Drudge, at Overmyer's order, brought the router and sander back and tagged them for identification. Overmyer came in with the rifle and ordered it tagged. All of them were locked up in a big safe in the police station.

On Monday, Drudge was told by Overmyer to "keep my mouth shut about anything that had happened—to let the State Police or whoever it was find out for themselves."

On Wednesday, Drudge told Overmyer that he had told the truth to the State Police, to which Overmyer replied, " 'You ruined twelve years of my career. I don't know how I am going to get a job with my bad back . . . You blew it, you dumb son-of-a-bitch.' "

At a later meeting with the mayor, Overmyer stated, " 'If I am suspended or fired, more than one person is going to swing besides me.' " Overmyer also stated that he was going to deny everything.

Rhodes' brother Tom testified that Overmyer told him to destroy a statement concerning the stolen rifle, which Bobbie had made earlier. He further testified, "I started to tear it up and throw it away, and he said, 'I said, get rid of it,' and so I burned it." "In the kitchen sink."

Overmyer contends that the above evidence was insufficient

to prove his guilt beyond a reasonable doubt. The State contends that in order to withstand a motion for directed verdict, it need only present a prima facie case. *Holliday* v. *State, supra.*

We are in accord with the State's position. As the court said in *State* v. *Robbins* (1943), 221 Ind. 125, 46 N.E.2d 691:

> "If . . . there was some evidence which, if believed, would support every ultimate issue of fact, we decide as a question of law that the court erred in giving the peremptory instruction" [for directed verdict].

Overmeyer relies on *Taylor* v. *State* (1972), 257 Ind. 664, 278 N.E.2d 273, wherein our Supreme Court said:

> "If her testimony were inherently improbable and uncorroborated, the court should direct a verdict for the defendant, . . ."

We cannot say, as a matter of law in the case at bar, that the evidence adduced at the trial was inherently improbable.

Overmyer further relies upon *United States* v. *Taylor* (2d Cir. 1972), 464 F. 2d 240. This case abrogated what was known as the "Second Circuit rule" and is not dispositive of the case at bar.

Under Indiana law we are constrained to hold that the directing of the verdict for appellee was contrary to law.

Appeal sustained.

Robertson, P.J. and Lowdermilk, J., concur.