309 N.E.2d 833 (1974)
Thelma ROBINSON, Appellant,
v.
STATE of Indiana, Appellee.
No. 2-1072A80.
Court of Appeals of Indiana, Second District.
April 15, 1974.
*836 Dennis E. Zahn, Symmes, Fleming, Ober & Symmes, Indianapolis, for appellant.
Theodore L. Sendak, Atty. Gen., Wesley T. Wilson, Deputy Atty. Gen., Indianapolis, for appellee.
WHITE, Judge.
Defendant-appellant (Thelma) was tried before a jury on an indictment charging her with second degree murder in the death of her fifteen month old son "Chris". The jury found her guilty of voluntary manslaughter for which the court sentenced her to imprisonment for not less than two years nor more than twenty-one years. We reverse for error in refusing to give either of two tendered jury instructions to the general effect that if motive had not been proved that was a circumstance favoring defendant.
The State's evidence was substantially as follows:
On the evening of July 22, 1971, Thelma, then aged twenty-two, and the mother of four children, two older and one younger than Chris, was with her children and other members of the family, as a guest at the Marion County (Indianapolis) suburban home of her mother. A family barbeque was being held for a cousin who was returning to military duty following a furlough. (Thelma was separated from her husband. She and her children lived in a house in the inner city.)
At 8:00 P.M. three members of the Washington Township Fire Department came to the mother's house in response to a call for first aid. They entered the house and found Chris lying on a couch in the family room. The one fireman who testified noticed quite a bit of mucus around Chris's nose and blood and a cut on the bottom half of the upper lip. The boy was not conscious and the fireman could not detect breathing. He set up the oxygen, then returned to the truck to get the first aid kit and to radio for the ambulance to "step on it". On returning to the house he obtained the child's name, age and address by speaking with Thelma's mother in the family room and with Thelma in a rear bedroom. He then asked who would go to the hospital with the child and was told that Thelma's seventeen year old brother, Chris's uncle, would. He took the teen-age uncle to the ambulance and then returned to the house to retrieve his gloves and first aid kit, having been out of the house about two minutes. While he was picking up his gloves and kit in the family room he heard voices which sounded to him like they came from the hall where the bedrooms *837 were. The voice he identified as being that of Thelma's mother said:
"You shouldn't have thrown the baby against the wall. You were beating him too hard."
The voice he said was Thelma's answered:
"Shut up."
He thereupon immediately left the house.
A pathologist who performed an autopsy on the body of the deceased child testified that on external examination he found bruises on the forehead and lips. On opening the skull he discovered lineal fractures of the skull, blood under the sheets that form the hard portion of the skull and contusions of the brain itself "by the site of the fractures". The cause of death was these cranial and cerebral injuries. He was of the opinion that the cause of these injuries "has to be a substantial blow, because the skull of a younger person is elastic, so it can support or tolerate force applied to it more than an adult person." He could not imagine that the injury could have resulted from the child falling from a standing position, but if the child were thrown against a wall that "might" cause it. He could not tell whether a fall from a table top could cause it, but he knew of a child's skull fracture, not similar to this one, which was caused by a fall from a height of five to six feet. And, finally, that the skull was fractured,
"When a force was applied to the skull. The type  the manner with which that force was applied to the skull, I cannot say. Now, the force, I said, was applied from the front to the back, like a plastic bowl, when you press upon it in the sides, and it cracks in the center. That's the way these fractures were produced, and in relation with what we have observed."
The testimony of a sheriff's department detective sergeant established that the child died in his presence at Methodist Hospital at 9:29 P.M. He thereafter went to the defendant's mother's house where he was shown the dining room area as the place where the child sustained its injury. The floor was covered with wall-to-wall shag carpeting and one wall was brick. At his request the defendant, her mother, and her brother (who had gone to the hospital with Chris) accompanied him "down to the sheriff's office, so we could make an investigation".
After defendant had been properly advised of her rights and had signed a "Miranda" waiver, the Sergeant testified that he
"had a conversation with her. She stated, that she was twenty-two (22) years of age. She resided at 1133 1/2 West 34th Street, and she was a married lady, but separated at this time, and was the mother of four (4) children, April being four (4) years old, Ronnie being two (2) years old, Cristopher Clay was fifteen (15) months, and Anthony Scott was two (2) months. She stated that on the evening of July 22nd, she came over to her mother's house, between six thirty (6:30) and seven (7:00) P.M. for a cookout, and that all four (4) of her children had been playing out in the backyard on a patio. She stated that she came into the house, and she found Cristopher Clay lying on the carpet in the dining room area of the house. She stated that she picked Cristopher Clay up, and she was sitting on a chair. She picked him up by his fingers, and was attempting to get him to walk, and he let go of her fingers and fell backwards on the carpet. She stated then she picked him up again with her fingers, with him grasping her's, picked him up, and jiggled him up and down just a little bit, attempting to get him to walk, and he let go, falling backwards again on the carpet. I asked her if anything else had happened, and she stated that she might have set him down maybe too hard on his seat one time; and the last time, after he fell, she left him lying on the carpet on his back, and went to another *838 area of the house, and this is all that she knows, until her mother came in, and told her that Cristopher Clay was sick, and they called the fire department. I further asked her if she knew how he had received an abrasion or mark on his lip, and she stated that he had picked up a lit cigarette, and stuck it in his mouth. I further asked her if Christopher Clay had ever received any injuries or been treated in a hospital before, and she stated that back in February, that the child had partially fallen out of a broken baby bed, and had hung by it's right leg for quite some time, fracturing the right hip, and this had been treated by a Doctor Sims, at 3140 North Illinois Street. This was about the basis of her conversation, at this time, and after this time she was placed under arrest."
He also saw on Chris's body "the bruise, a very noticeable one, on the left side of the forehead, the abrasion on the lip, and also I observed a mark on the buttocks area of the child, which I was unable to determine what caused it."
On that evidence the State rested. The defendant's motion for a directed verdict was overruled. In that ruling we find no error, albeit the evidence of defendant's guilt may be meager. Nevertheless the pathologist's testimony was sufficient to warrant a finding that the child Chris died as the result of violence, i.e., his head coming forcibly into contact with a blunt instrument producing a fracture of his skull and a contusion of his brain. This was sufficient proof of the corpus delicti. Brown v. State (1958), 239 Ind. 184, 190, 154 N.E.2d 720; Jones v. State (1969), 253 Ind. 235, 246, 252 N.E.2d 572, 19 Ind.Dec. 531.
Defendant's response to her mother's reproach, as allegedly overheard by the fireman, could be understood as an admission that she threw the baby against the wall and that she was beating him too hard. From evidence of the corpus delicti and the facts thus admitted, a purposeful and malicious killing (second degree murder) could be inferred. Some finders of fact might demand more convincing evidence before holding that every reasonable doubt had been overcome, but that is not the test for this ruling. All that is required is a prima facie case, which is to say, substantial evidence of probative value sufficient (directly and by reasonable inference) to sustain each element charged. Holliday v. State (1970), 254 Ind. 85, 87, 257 N.E.2d 679, 21 Ind.Dec. 199; State v. Overmyer (1973), Ind. App., 294 N.E.2d 172, 36 Ind.Dec. 24.
Neither the trial judge in ruling on the motion for directed verdict nor this court in reviewing that ruling is permitted to weigh the evidence. State v. Overmyer, supra. The trial court committed no error in refusing to direct a verdict for the defendant.
The defendant's evidence consisted of the testimony of her mother, Genevia Phelps; her sister, Rita Phelps, age 13; her brother Kenny Phelps, age 17; her next door neighbor, William Turrentine, age 58; Joetta Turrentine (apparently William's wife); Diana Pittman, a friend for whom defendant had baby sat; and defendant herself.
Defendant denied having had the conversation with her mother which the first-aid-fireman testified he overheard. She testified that she had three or four beers before she went to her mother's house and about three after she got there. She was sitting on the patio talking when Chris needed changing so she brought him into the dining room where she played with him for about five to ten minutes. He was laughing and enjoying the play. She was not angry with him. The play included tossing him high into the air. He slipped through her hands and fell. She didn't know what happened then; she was just standing there too shocked to scream; her mother came in, her brother came in, and her sister came in. Her mother told her brother to call the rescue squad. She was *839 in the bedroom; didn't see them come; did ask one fireman what was wrong with her baby; was told he didn't know, they were taking him to the hospital. She didn't go because she had had some beers and was upset and ashamed of beer on her breath. Her mother was upset with her because she wouldn't go to the hospital. Her mother took her and the children home. Her cousin and friends soon came by and she asked them to take her to the hospital. They took the children to her mother's where she learned Chris was dead. The police came and took her downtown and questioned her. She told the policeman that she was holding the baby by his hands and he fell back. She didn't tell him that she tossed the baby into the air. "Seemed like they was just trying to put words in my mouth, and I said I wan't going to say anything else until I saw a lawyer." On cross-examination she admitted having told a fireman that the baby was sick, he had a cold. She was cross-examined extensively concerning her drinking habits, how many beers she had drunk the afternoon of the tragedy, and the effect the beer had had on her. When asked whether she had told the detective she had eight beers she said she had had three at home and about four at her mother's. She was subsequently asked several questions about how often she drank eight beers. She admitted being "kind of woozy", but protested that it wouldn't make her want to hurt her own child. She maintained that she had been teaching the baby to walk, as she told the policeman, but admitted "that's not how it happened." She denied that she decided it happened by tossing after she "heard the doctor say it couldn't have happened the other way." (She answered before the court sustained her attorney's objection to the deputy prosecutor's "characterization". The court instructed the jury to "ignore the question ... in arriving at a verdict in this case.")
Defendant's mother testified that she had been in the dining room and saw Thelma standing at the dining table playing with the baby. Thelma was happy and the baby was happy. The mother went to tend to the barbeque and five minutes or so later returned to see Chris lying on the floor and Thelma sitting on a chair crying, almost in a state of shock. Thelma's mother picked the baby up and laid him on the living room couch and sent for the rescue squad. She did not know what had happened while she was out of the room. As to other matters her testimony was corroborative of the defendant's. She said that Thelma was the kind of mother that let her children do what they wanted to. "She'll yell at 'em, but as far as punishing them or beating them, she wouldn't know what they were... ." She denied saying to Thelma what the fireman testified she said but she admitted that she could have said Thelma should have known better than to play around the wall or next to the wall. On cross-examination she admitted having said to the detective that she might have said what the fireman said but if she did she didn't remember. She said that after the ambulance took Chris away she went to the bedroom where Thelma was and told her that she should have gone to the hospital regardless of the beer on her breath because she hadn't drunk that much.
Defendant's 13-year-old sister testified that she came through the dining room while defendant was holding Chris's hands, trying to let him walk; that Thelma was not angry nor was the baby crying. The sister went to the bedroom and watched TV. During the five or ten minutes she was in the bedroom she did not hear Thelma say anything to the baby nor did she hear the baby cry. She did hear a thump on the floor and came out to see Chris lying on the floor, Thelma sitting in a chair, and her mother coming in from the patio. The rest of her testimony paralleled her mother's. She denied hearing her mother say anything to Thelma.
The brother testified to having seen Thelma trying to walk the child some fifteen or twenty minutes before he heard a scream and came out of the bedroom *840 where he had been watching TV and was sent by his mother to call the rescue squad. When he saw Thelma trying to walk Chris, the child was laughing; Thelma was not angry. After he heard the scream Thelma was sitting in a chair crying. In other details his testimony duplicated in substance, that of his mother and sister. On cross-examination he said he didn't remember telling the police he had heard his mother and Thelma arguing but did remember that he had heard them arguing before the baby fell but he didn't know what about. He thought Thelma didn't go to the hospital because she was too upset  not because she was too drunk.
None of the other witnesses was at the barbeque where the fatal injury occurred. William Turrentine testified that Thelma's reputation for truthfulness and veracity and for peacefulness and quietness was good and that she was young and loving mother who did not mistreat her children. He said he had repaired the baby bed after Chris had injured his leg. (The detective sergeant had testified that defendant had told him of the incident when he questioned her the night the child died.)
Joetta Turrentine lived next door to Thelma, saw her every day when Joetta came home from work; knew she was a loving mother who did not abuse her children and thought that her reputation for truthfulness was "pretty good" and her reputation for peacefulness and quietness was good. On cross-examination she did not know Thelma's reputation for drinking.
Diana Pittman, Thelma's friend, a hospital nurse's aid with whose children Thelma baby sat knew Thelma's reputation was good, both for truthfulness and for peacefulness. She knew Thelma was good to children, did not beat or mistreat them and did not treat Chris in any way differently than her other children.
We have recited, in greater detail than may at first blush appear pertinent, the testimony of the defendant's witnesses. Our purpose is to demonstrate the theory of defendant's defense  that defendant had no motive for killing her son and that his fatal injury was an accident  and to demonstrate that the State countered this theory with the repeated suggestion (substantiated by defendant's admissions) that the child was injured because defendant was intoxicated. These features of the trial are considered pertinent to the issue of whether the jury's verdict is sustained by sufficient evidence and conforms to law and to the issue of whether the trial court erred in refusing a tendered instruction regarding motive. But before we reach those issues we should determine whether certain crucial evidence was properly admitted.
Defendant contends that it was error to permit the fireman to testify to having overheard the alleged conversation between her and her mother.[1] She argued that it was hearsay and not within any exception to the hearsay rule. The State justified it as an admission against interest, citing Diamond v. State (1924), 195 Ind. 285, 144 N.E. 466, and Gayer v. State (1965), 247 Ind. 113, 210 N.E.2d 852. In Diamond the rule is stated thus:
"Where a charge is made in the presence and hearing of a person accusing him of a crime, his silence, or failure to contradict or explain the statement, may be shown, as being in the nature of an admission of the truth of such statements, providing the circumstances are such as to afford him an opportunity to speak and such as would naturally call for some action or reply from persons similarly situated." (Id., 195 Ind. at 291, 144 N.E. at 468.)
The "charge" quite clearly is hearsay. Standing alone it is not admissible (unless it does happen to be a part of the res gestae). It is the defendant's reaction to the charge which is admissible if it *841 constitutes either a clear admission of the truth of the charge or a failure to deny (when the circumstances are such that the person accused would be expected to deny). Silence on the part of the accused renders the accusation admissible only when it is shown that the charge is heard and understood by the accused (and under circumstances calling for a reply). Diamond, supra, at 291, 144 N.E. 466. Failure to show that the charge was heard and understood rendered it inadmissible in Myers v. State (1922), 192 Ind. 592, 597, 137 N.E. 547, on which appellant relies. Here, however, the defendant's reply is sufficient evidence of her having heard and understood to overcome any objection based on the Myers case.
The most substantial question appellant raises with respect to this evidence is her contention that her reply was, in fact, a denial. If that is true, it was error to allow the jury to hear the evidence and we cannot consider it in determining the sufficiency of the evidence. Diamond at 294, of 195 Ind. 144 N.E. 466.
Appellant's brief argues that
"[t]he term `Shut-Up' as used in the colloquial English language is a term meaning denial or contradiction. For example, when one school boy calls another a `sissy', the boy blurts out `Shut-Up'. He obviously does not mean to imply an admission that he is in fact a sissy. He is saying in effect, I am not and don't say that I am."
In the context of some conversations "Shut-Up" may be a denial, but we cannot agree that in the context of the fireman's testimony it can only be understood as an unequivocal denial. It is, in fact, susceptible of more than one meaning. In short, it is an equivocal response which renders admissible both the accusation and the reply. Commonwealth v. Madeiros (1926), 255 Mass. 304, 313, 151 N.E. 297, 299, 47 A.L.R. 962; Rex v. Christie [1914] A.C. 545, 564, 565; Commonwealth v. Trefethen (1892), 157 Mass. 180, 197, 31 N.E. 961, 24 L.R.A. 235; Diamond v. State, supra, 195 Ind. at 295, 144 N.E. 466.
The danger involved in allowing a jury to hear evidence consisting of a hearsay accusation and an equivocal reply by the accused is that the hearsay, rather than the defendant's reply to it, may convince the jury that defendant is guilty  even when the jurors understand the response as a denial. That danger was impliedly recognized by the Massachusetts Court when it said, in Commonwealth v. Trefethen, supra (as quoted in Diamond, supra, 195 Ind. at 296, 144 N.E. at 470):
"`We cannot presume that the court did not take pains properly to instruct the jury upon the legitimate use to be made of the evidence admitted, and to warn the jury that the statements made to the defendant were not to be considered, in and of themselves, as any evidence of the facts stated.'"
In the instant case the record reveals that the trial court gave, on his own motion, seventeen preliminary instructions and nineteen final instructions (along with two instructions submitted by defendant), but not one instruction referred to the legitimate use to be made of the fireman's testimony of the conversation he overheard, nor was any admonition given to the jury at the time the evidence was received.
Nevertheless, as was also true in Diamond, supra,
"... no complaint is made of the absence of instructions limiting the purpose of the evidence, and no such instruction was requested, so that if the evidence was admissible for any purpose the appellant cannot now complain." Id. at 296, 144 N.E. at 470.
The fireman-first-aid-man's testimony also provides the basis for the appellant's contentions that the verdict is contrary to law and is not supported by sufficient evidence. She challenges it as insufficient to *842 meet what she speaks of as "the `quantum of proof' necessary to establish guilt in a criminal case." The essence of her argument is that the witness had had such brief prior contact with defendant and her mother that he was not qualified to identify them as the speakers merely because he was of the opinion that the accusing voice sounded like the mother's and the responding voice like defendant's. The authority with which this attack is supported consists of general statements from Seats v. State (1970), 254 Ind. 457, 260 N.E.2d 796, concerning our duty to determine whether circumstantial evidence is sufficient to exclude every reasonable hypothesis of innocence and from Gaddis v. State (1969), 253 Ind. 73, 251 N.E.2d 658, and Baker v. State (1956), 236 Ind. 55, 138 N.E.2d 641 (two sight identification cases) concerning the dangers of testimonial errors resulting from imperfect perception. The State counters with three Indiana cases in which testimony involving voice identification was held admissible. In none does it appear certain, however, that the conviction rested solely on the voice identification. In Barnes v. State (1971), Ind., 266 N.E.2d 617, it appears that the identifying witness had no prior acquaintance with her attacker but she did hear his voice over a much longer period than did the witness at bar and there was additional evidence tending to corroborate her identification. The court there said:
"This Court has recognized the validity of voice identification in criminal prosecutions. Allison v. State (1960), 240 Ind. 556, 166 N.E.2d 171; Deal v. State (1895), 140 Ind. 354, 39 N.E. 930. See also 29 Am.Jur.2d, Evidence § 368 where it is stated: `Since an early period, witnesses' testimony of identification of a person by having heard his voice has been regarded as legitimate and competent to establish identity in both criminal and civil cases.'" (266 N.E.2d at 618.)
That error in identification of strangers is possible and that it sometimes occurs we would suppose is generally conceded; but that the possibility of error in any particular case may be so great as to concern the appellate court has seldom been recognized. Baker and Gaddis, supra, are probably the only two Indiana cases in which convictions resting on identification have been reversed because the appellate tribunal found the identifying witness's testimony to be insubstantial. The usual appellate viewpoint is well expressed in Medsker v. State (1946), 224 Ind. 587, 590, 70 N.E.2d 182, 183:
"`Identification is almost always a matter of opinion or belief' concerning a fact. 42 C.J.S. Identification, at p. 375. `And a conviction may be sustained, although a witness declines to swear positively and testifies merely that he believes accused is the person whom he saw commit the crime.' 23 C.J.S., Criminal Law § 920, p. 192; Commonwealth v. Cunningham, (1870), 104 Mass. 545, 547. State v. Franke (1901), 159 Mo. 535, 542, 60 S.W. 1053. The question of identity is one of fact and not of law. Therefore all evidence bearing upon the question must be submitted to the jury, and it is for the jury to determine whether it is satisfactory and trustworthy."
This court is committed to that view. Hardin v. State (1972), Ind. App., 287 N.E.2d 359, 32 Ind.Dec. 579 (Trans. den.). Therefore, we cannot sustain appellant's challenge to the sufficiency of the evidence on that ground.
But there is still another facet of the sufficiency issue. The State suggests that the defendant's own testimony could have been the basis of her conviction, arguing that "[w]hether the jury believed that she killed the baby by throwing him against the wall or [after she had consumed seven beers] by throwing him in the air and letting him fall to the floor, the evidence was sufficient to sustain their verdict."
We have already held that the trial court committed no error in overruling defendant's motion for a directed *843 verdict at the close of the State's case-in-chief. Had the jury found the defendant guilty of second degree murder our ruling on the directed-verdict-motion would also settle the question of the sufficiency of the evidence to sustain the verdict. The same would be true if the verdict had found the defendant guilty of a lesser included offense because "it is impossible to commit the greater offense as charged in the indictment or affidavit, without first having committed the lesser offense."[2] "... [I]f a party is charged with a given crime, he can not be convicted of another crime of lesser magnitude ... unless a conviction of the crime charged necessitates proof of all the essential elements of the lesser offense... ."[3] But that is not true in this case because it is possible to commit second degree murder without first having committed voluntary manslaughter nor does conviction of second degree murder necessitate proof of all the essential elements of voluntary manslaughter. In fact it is not possible for one to commit murder in either degree by first committing voluntary manslaughter. One commits murder in the first degree by killing a human being "purposely and with premeditated malice."[4] If there is no premeditation, and the killing is done "purposely and maliciously" the crime is second degree murder.[5] And every intentional killing which is not in self defense, or otherwise legally justified, is done "purposely and maliciously" unless it is the result of sufficient provocation, which rebuts the inference of malice and reduces the crime from murder in the second degree to voluntary manslaugher.[6]
"If a sane man, without accident, justification, or any provocation, suddenly kill another, even a stranger, the act must be attributed to malice, because it could be accounted for upon no other hypothesis, based upon the laws governing the action of the mental and moral faculties of man. Such an act would evince a degree of depravity of heart, almost excluding the possibility of any higher moral feeling than malice against all mankind. But human experience will bear witness that provocation may excite a transport of passion, accompanied by a momentary intention to kill the dearest and most beloved friend, against whom no malice exists. And passion, upon sufficient provocation, tends to rebut the presumption of malice." Dennison v. State (1859), 13 Ind. 510, 511.
"By these instructions the jury were told, in effect, that there could be no purpose to kill in manslaughter, and that if such a purpose were shown to exist, the killing would be murder. This, we think, is not a correct exposition of the law. The killing may be unlawful, and purposely done, and yet if it is done without malice, in a sudden heat and transport of passion, caused by a sufficient provocation, it is only manslaughter. It was so held in Dennison v. The State, 13 Ind. 510. It is also apparent from the definition of manslaughter given in the statute, viz.: `If any person shall unlawfully kill any human being without malice express or implied either voluntarily upon a sudden heat, or involuntarily, but in the commission of some unlawful act, such person shall be deemed guilty of manslaughter.' &c. `Voluntarily' means, by the free exercise of the will, done by design, purposely. *844 "To constitute murder in the second degree, the killing must be unlawful  that is, without justification or legal excuse  and it must be done purposely and maliciously.
"Malice may be proved by direct evidence, such as seeking an opportunity to perpetrate the act by lying in wait, prior threats, &c. This is denominated express malice, and such proof would be evidence of premeditation, and would make the offense murder in the first degree. Malice may also be implied from the act of killing; as, if the killing is done purposely, without justification, legal excuse, or reasonable provocation, malice is implied from the act. And if the act is perpetrated with a deadly weapon, so used as likely to produce death, the purpose to kill may be inferred from the act; because it is but reasonable to infer that a party intends to do what his wilful act is palpably calculated to effect.
"But although the killing may be unlawful, and done purposely, yet if it is done in a sudden heat of passion, caused by a sufficient provocation, and in the absence of express malice, malice is not implied from the act, and the offense is manslaughter. But it should be remembered that words only  however abusive and insulting they may be  cannot constitute a sufficient provocation to rebut the presumption of malice arising from the act, and reduce the offense from murder to manslaughter." Murphy v. State (1869), 31 Ind. 511, 513.
"It is well settled that the sudden heat of passion sufficient to reduce a homicide from murder to manslaughter must be accompanied by adequate provocation. Henning v. The State (1886), 106 Ind. 386, 400, 6 N.E. 803, 812, 7 N.E. 4." Yarber v. State, (1962), 242 Ind. 616, 619, 179 N.E.2d 882, 883.
In Henning (cited supra, in the quotation from Yarber v. State), the court had said:
"We understand the law to be perfectly well settled that an unlawful taking of human life, when done purposely, is murder, unless there is a sufficient provocation. It is the provocation that reduces the crime to the grade of manslaughter. The provocation must be a sufficient one to engender passion, for without provocation the crime is murder, and the provocation must be a sufficient one, otherwise the passion will not mitigate the offense. There are many cases declaring that passion alone is not enough, but that there must be an adequate provocation arousing the passion. Boyle v. State, supra [105 Ind. 469, 5 N.E. 203]; Murphy v. State, 31 Ind. 511; People v. Turley, 50 Cal. 469; 2 Bish. Crim. Law, §§ 701, 704." (Our emphasis.) (106 Ind. at 400, 6 N.E. at 812.)
In Williams v. State (1925), 196 Ind. 84, 93, 147 N.E. 153, 156, the court said:
"The statement in the [Henning] opinion ... that `it is the provocation that reduces the crime to the grade of manslaughter' is not, standing alone, technically accurate. It is the sudden and violent heat of passion, induced by sufficient provocation, and not the provocation which reduces the homicide from murder to manslaughter. There may be an adequate provocation under circumstances that would not distract the mind of the actor from a cool and deliberate purpose of forming a plan to take the life of the person killed. In such case, the provocation, although seemingly adequate, would not necessarily reduce murder to manslaughter."
But the point made in both Henning and Yarber is that without evidence of provocation the inference of malice is not destroyed and the crime is not reduced from second degree murder to voluntary manslaughter. Thus, to prove voluntary manslaughter it is necessary to prove not fewer facts than are necessary to prove second *845 degree murder, but more facts; more, because the "sudden heat" which negates the implied malice of second degree murder is never implied from the voluntary killing. There must be evidence of an adequate provocation; evidence which is unnecessary in proving second (or first) degree murder.
Here, there was no evidence of provocation, no evidence of anger, or sudden heat. In short, no evidence from which the jury could have found the essential elements of the crime of voluntary manslaughter, of which it found defendant guilty. (Even if we were to assume [which we do not] that adequate provocation not shown by direct evidence may be inferred from circumstances surrounding the killing, it is beyond the capacity of our imagination to hypothesize any act of adequate provocation of which a fifteen-month old baby could be guilty.) Neither the State's evidence nor the defendant's evidence nor any combination of parts of the two makes even a prima facie case of voluntary manslaughter.
A prima facie case of involuntary manslaughter, however, is well made out by both versions of what caused the child's death. As was said in Minton v. State (1964), 244 Ind. 636, 638, 195 N.E.2d 355, 356, and repeated in Mimms v. State (1967), 249 Ind. 168, 171, 231 N.E.2d 151, 153: "It is only necessary that the killing be done in the commission of an unlawful act." Those cases also note that "intent is not required for a conviction of involuntary manslaughter." 249 Ind. at 172, 231 N.E.2d at 153. Nor is it necessary that the "act" be a crime, or prohibited by statute, to be an "unlawful act". State v. Dorsey (1889), 118 Ind. 167, 168, 20 N.E. 777, 10 Am.St.Rep. 111. "To constitute [involuntary] manslaughter, the act causing death must be of such character as to show a wanton or reckless disregard of the rights and safety of others, but not necessarily an act denounced by the statute as a specific crime." Id. at 169, 20 N.E. at 778.
If the jurors believed the defendant intended to kill her baby and that she did so either by beating him too hard, or by throwing him against the wall, or by throwing him in the air and allowing him to fall on the floor, the law says that intentional killing must be attributed to malice because there is no evidence of sudden heat induced by a sufficient provocation, which would have been necessary to rebut the implication of malice and thereby reduce the intentional killing to voluntary manslaughter. Thus, if they believed the killing was intentional their verdict should have been that the defendant was found guilty of second degree murder.
If, on the other hand, they believed she had no intention of killing the child but that she nevertheless did so by an act committed in wanton or reckless disregard of the child's safety, their verdict should have found her guilty of involuntary manslaughter. The wanton or reckless act causing death could well have been (consistent with the evidence) either beating the child too hard, throwing him against the wall, or tossing him high in the air in play when she was inebriated to the point that she should have realized she might not be able safely to catch him.
But although there appears to be no way consistent with the evidence and the law that the jury could have found the defendant guilty of voluntary manslaughter[7], we are nevertheles not authorized to reverse for that reason. In *846 Hasenfuss v. State (1901), 156 Ind. 246, 59 N.E. 463, the defendant was charged with having committed first degree murder by poisoning the deceased. Conceding "it may be difficult to conjecture a case where the crime of manslaughter can be said to be committed by means of administering poison", (Id. at 252, 59 N.E. at 466) the court nevertheless concluded that the jury had that right and power by virtue of the constitutional right to determine the law (Art. I, § 19, Ind.Const.) and the following statutes:
"Sections 259, 260, Cr.Code, being sections 1903, 1904, Burns Rev.St. 1894, provide as follows: Section 259. `Upon an indictment or information for an offense consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the indictment or information, and guilty of any degree inferior thereto or of an attempt to commit the offense.' Section 260. `In all other cases the defendant may be found guilty of any offense, the commission of which is necessarily included in that with which he is charged in the indictment or information.'"[8]
(Id. at 250, 59 N.E. at 465.)
The evidence was not in the record. They opined that notwithstanding counsel's assertion that a case of voluntary manslaughter by poisoning could not be imagined, "[i]t appears, however, that the jury ... discovered such a case." (Id. at 252, 59 N.E. at 466.) The judgment was affirmed.
In Crickmore v. State (1938), 213 Ind. 586, 12 N.E.2d 266, defendant was a union truck driver who, with others[9], was indicted for the first degree murder of a nonunion driver who was killed when a rock was thrown through the windshield of the truck he was driving. A prima facie case was made that defendant and the others did the act pursuant to a conspiracy to stone the trucks of the victim's employer to induce it to enter into a union contract. Defendant was found guilty of voluntary manslaughter. In sustaining the judgment the Supreme Court said:
"One of the causes assigned in the motion for a new trial is that the verdict and judgment are not supported by the evidence. As we understand appellant's contention, it is that, although the intentional and premeditated throwing of stones from an automobile, running at 70 miles an hour, into the windshield of an approaching truck, if such an act is reasonably calculated to produce death, is sufficient evidence of an intention to kill, it is also sufficient to establish premeditation and malice; that, if the jury believed there was an intention to kill, their verdict should have been for murder, and not manslaughter; that, since the verdict was for the lower offense, the jury must have assumed that appellant only intended the unlawful act, consisting of throwing the stones, and that the verdict should have been for involuntary manslaughter. It is difficult to understand how the jury concluded that appellant was guilty of voluntary manslaughter, which implies an intentional killing, since it is clear from the evidence that, if he intended to kill, it was a planned and premeditated killing, which would be murder in the first degree, whereas, if the killing had been unintentional, and only the unlawful act of throwing the deadly missiles had been intentional, it would have been involuntary manslaughter. But it will be seen that the objection to the evidence supporting the verdict is that it is too much, and not that it is too little.[10] In Hasenfuss *847 v. State, (1901), 156 Ind. 246, 252, 59 N.E. 463, 466, it was insisted that no set of circumstances could be imagined which would render it possible to reduce the crime of murder, by means of poison deliberately administered, to that of voluntary manslaughter. The court said: `It is possibly true, as insisted by counsel for appellant, that it may be difficult to conjecture a case where the crime of manslaughter can be said to be committed by means of administering poison. Be this as it may, the question here involved relates solely to the right or power of the jury, and, when that right or power is once found to exist, the question may be said to be closed.'" (Our emphasis.) (Id. at 589, 12 N.E.2d at 267.)
The Crickmore court then said of the evidence in the record:
"It is sufficient to sustain the jury's verdict that the killing was voluntary, and, more, it would have been sufficient to sustain a verdict of murder in the first degree, since, if the missiles that caused the death were thrown at all, they were thrown premeditatedly and upon a preconceived plan, and a planned killing cannot but be malicious. Courts have power to set aside a verdict where the evidence is insufficient to sustain it, but no power to set aside a verdict which is sustained by the evidence, because there is no finding of guilt of a higher crime, which the evidence would also have sustained." (Id. at 591, 12 N.E.2d at 268.)
Because there was obviously no evidence in the Crickmore case from which the jury could have found a sudden heat upon adequate provocation,[11] we believe the court was in error in saying that the verdict it was called on to set aside "is sustained by the evidence". But whether we are right or wrong in that belief, the case stands as authority for the proposition that we have no power to set aside a voluntary manslaughter verdict when the evidence would have sustained a finding of guilt of the higher crime of second degree murder. Furthermore, it has received recent approval by our state's highest court in Barker v. State (1958), 238 Ind. 271, 150 N.E.2d 680, and Mimms v. State (1967), 249 Ind. 168, 231 N.E.2d 151, although not in express reference to the rationale of our present analysis.
The rule that we have no power to set aside the verdict in this case because it is supported by evidence sufficient to sustain a conviction of the degree of homicide charged, though insufficient to make a prima facie case of the degree of the verdict, does not mean that the jury acted properly in returning the verdict or that the trial court was not in error in instructing it that it could return such a verdict.
In Cole v. State (1922), 192 Ind. 29, 134 N.E. 867, the Supreme Court had before it an appeal in a case in which the appellant had been convicted of first degree murder under a count of the indictment which charged that he had killed his victim in the perpetration of a robbery by beating him with a blunt instrument. In upholding trial court's refusal to instruct the jury that under this felony-murder count the appellant could be convicted of manslaughter, the court said:
"That an instruction need not be given in a criminal case unless there is evidence to which it is applicable has been decided by this court. Harlan v. State *848 (1921), 190 Ind. 322, 130 N.E. 413, 418. [Id. at 36, 134 N.E. at 870.]
* * * * * *
"The constitutional right of the jury to determine the law as well as the facts in a criminal case does not impose upon the trial court a duty to instruct them that the law of murder and manslaughter is something different from what it has been declared by statute, nor to suggest to the jury that they may decide otherwise than according to law. [Id. at 37, 134 N.E. at 870.]
* * * * * *
"A jury might have power to stultify itself by returning a verdict contrary to what it knew to be the law, since jurisdiction to decide includes power to decide wrong. But the court, when giving instructions, is not required to insult the jurors by a suggestion that they may do so. And since it is clearly the law that if the accused killed the deceased in the perpetration of a robbery he was guilty under the law of murder in the first degree, there was no error in giving instructions to that effect. [Id. at 37, 134 N.E. at 870.]"
In the recent case of Hash v. State (1972), Ind., 284 N.E.2d 770, 31 Ind.Dec. 647, the defendant was charged with robbery and convicted of the lesser offense of theft from the person. He complained, on appeal, that the trial court had refused to instruct the jury that it could convict him of theft not from the person, or "simple theft". In sustaining the refusal the court said:
"Defendant argues that simple theft is necessarily an included offense in the charged offense of robbery, and we cannot dispute his contention when viewed both in the pale of the statute and that of the charging affidavit. An additional factor, however, must logically come into play, one that does not appear to have been recently considered, at least in this state, although a similar situation was before this Court and determined consistently with our holding herein in the case of Cole v. State (1921), 192 Ind. 29, 134 N.E. 867. When we view the evidence in the case at bar, we at once must recognize that the only evidence of a `taking' was that the money and French bills were taken from the person of Williamson. The only testimony to the contrary was that of the defendant, who testified that he found the French bills, which would be no offense. The jury would have been justified in finding for the defendant upon his testimony, or as it did for the State upon Williamson's testimony that the items were taken from his person. It could not, however, disbelieve the testimony of both Williamson and the defendant and speculate upon a third factual situation upon which there was no evidence. This is an altogether different situation than one where the additional element contained in the greater offense is one of a state of mind which may be inferred, or not, from the overt acts. In a case such as first degree murder, for example, although the evidence clearly supports all the requisite elements, the jury may decline to believe that the act was premeditated or with malice and, under such circumstances, find a lesser offense not requiring such elements.[12] *849 Here, we are concerned with an overt act. If it was committed at all, it was a taking from the person of Williamson. There was a void as to any probative evidence from which the jury could find any other taking, and an instruction upon the lesser offense of simple theft would have been improper, as not being applicable to the evidence. [Id. at 773.]"
In Hitch v. State (1972), Ind., 284 N.E.2d 783, 791, 31 Ind.Dec. 674, the defendant was charged with robbery and found guilty of theft from the person. In affirming the judgment the court reaffirmed the rationale of Hash, supra, saying:
"We acknowledge an apparent incongruity in that, as contended by the defendant, it appears that since he offered no evidence, the same evidence presented by the State which supported a verdict of robbery [sic, theft] from the person equally supported a verdict of robbery by putting in fear. It is by virtue of this that the defendant insists that the verdict was a compromise verdict and invalid. The jury, however, was not required to find that the taking from the bartender was accomplished by putting him in fear, although there was considerable evidence to that effect. When it is clearly established that the crime charged was consummated and that the accused, who denies any connection with such crime, is either guilty of the crime charged or none at all, there is no basis for a verdict of guilty of a lesser offense. It was for this reason that an instruction upon the lesser included offense was properly denied in Hash v. State (supra). Where, however, the evidence is sufficient to support the verdict of the lesser offense, the verdict cannot be considered a compromise."
If Hash and Hitch are applicable to homicide cases, the trial court was in error when it instructed the jury that it could find the defendant guilty of voluntary manslaughter, but the defendant has waived the error by failure to object.[13] *850 And, in any event, under the Cole[14] rationale, it was improper for the court to instruct the jury that it could find defendant guilty of a crime (voluntary manslaughter) when there was no evidence before it of one of the essential elements of that crime (sudden heat induced by an adequate provocation).
We believe that a properly instructed jury would have been told that the verdict options open to it were, in effect, those compatible with the three lines of reasoning in the dissenting opinion in Hutchinson v. State (1967), 248 Ind. 226, 237, 225 N.E.2d 828, namely, (1) second degree murder, (2) not guilty, or (3) involuntary manslaughter.[15] Defendant has waived any complaint that her jury was not so instructed, but she has preserved one error with regard to instructions which does, we believe, have a bearing on the verdict.
The defendant tendered the following instructions which the court refused to read to the jury:
"DEFENDANT'S INSTRUCTION NO. 2
"If upon careful examination of all the evidence, the State has failed to show any motive on the part of the accused to commit the crime charged against her, then this is a circumstance which you the jury should consider in favor of the accused in making up your verdict.
"DEFENDANT'S INSTRUCTION NO. 3
"If, upon considering all the evidence presented the State has failed to prove motive, and that failure is sufficient to raise reasonable doubt in your minds, you are instructed that it is your duty to find the defendant, not guilty."
A trial court's refusal to give an instruction substantially identical to No. 2 was among the errors for which a second degree murder conviction was reversed in Porter v. State (1910), 173 Ind. 694, 704, 91 N.E. 340, 343.
A second degree murder conviction was reversed for other errors in Miller v. State (1944), 223 Ind. 50, 57, 58 N.E.2d 114, 116, in which the court said:
"The defense tendered an instruction to the effect that if the State had failed to prove a motive, and the failure was sufficient to raise a reasonable doubt in the minds of the jurors, it was their duty to acquit. In a number of other instructions the jury was advised concerning reasonable doubt, and it may not have been error to refuse this specific instruction, although it would seem, in the light of the facts, that it would have been highly proper to have given it as an aid to the jury in its deliberation."
Notwithstanding the foregoing approval of defendant's instruction No. 3 as seemingly highly proper in light of the facts in Miller, we doubt its applicability to the case at bar because it tells the jury that the effect of failure to prove motive could raise a reasonable doubt which would mandate a verdict of not guilty. We believe that what we have already said demonstrates that want of motive is entirely compatible with a verdict of involuntary manslaughter, whether "motive" is thought of as the defendant's emotional or mental state or as some external fact which may have caused that state of mind.[16] That *851 view is expressed in Nelson v. Commonwealth (1925), 143 Va. 579, 130 S.E. 389, 391, which upheld the trial court's refusal to instruct on want of evidence of motive in an involuntary manslaughter case, saying:
"The instruction, as asked, was only applicable to a case where the act was a voluntary act. Where an act is charged to have been involuntary, the absence of any motive to commit it raises no presumption of innocence and is wholly irrelevant."
Also in People v. Schwartz (1921), 298 Ill. 218, 131 N.E. 806, 808, which said:
"The charge was manslaughter, and there was not the slightest evidence of voluntary manslaughter as defined by the statute; that is, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible... . Motive is an influence which tends to move the will toward some action. Involuntary manslaughter occurs without intention or will or motive to commit the crime."
But we do believe that it is quite obvious, in light of the evidence as we have recited it, that motive was an issue in this case. It was an issue both as respects defendant's apparent state of mind or emotional attitude toward the child who was killed and with respect to any reason, cause, or other external circumstance which may have caused or contributed to her state of mind. It was an issue relevant to the jury's finding that she was guilty of voluntary manslaughter, which is a finding that she voluntarily, intentionally, or purposely killed her child.
The similarities between the case at bar and Porter v. State, supra, in which the refusal of a "motive" instruction was held to be error, are apparent in the following quotations from that opinion, beginning in 173 Ind. at 704, or 91 N.E. at 343:
"The theory advanced upon the trial by appellant's counsel, and the one which they seek to maintain in this appeal, is that the death of the decedent resulted from the accidental discharge of the shotgun, as testified by appellant upon the trial. As previously stated, there was evidence given in his behalf to show that the relations between him and his wife had always been amicable and good, and that he held her in high regard. His counsel claim that this evidence disclosed that there was an entire absence of any motive upon his part for murdering his wife.
"The charge of the court to the jury upon the question of motive was quite general. It merely stated that: `motive and purpose, like malice and criminal intent, as a rule, can only be inferentially proved. * * * Proof of a motive to commit the crime is not indispensable, nor is it essential to a conviction. While motive may be shown as a circumstance, to aid in fixing the crime on the defendant, yet the state is not required to prove a motive upon the part of the defendant, in order to convict, but the jury would be justified in inferring the motive if the commission of the crime by the defendant is proved beyond a reasonable doubt as required by the law.'
"At the proper time appellant tendered to the court, with a request that it be *852 given, an instruction that, if the jury found upon a careful examination of all the evidence that it failed to show any motive on the part of the accused to commit the crime charged against him, `then this is a circumstance which the jury ought to consider in making up their verdict.' This charge the court, over the exception of the appellant, refused to give. No other instruction upon the question of motive was given except the general one to which we have referred, which wholly failed to present to the jury appellant's theory upon the evidence in the case in respect to a lack of motive upon his part for killing his wife.
"In cases of the character of [this] one ..., which depend for conviction wholly upon circumstantial evidence, the absence of any motive upon the part of the accused party for committing the crime charged against him is a circumstance to be considered by the jury in his favor, and the jury may give it such weight as they may consider proper. This principle is well settled and affirmed by the authorities. Kennedy v. People, supra [39 N.Y. 245]; Son v. Territory, supra [5 Okla. 526, 49 P. 923]; Pointer v. United States, supra [151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208]; State v. Rathbun, supra [74 Conn. 524, 51 A. 540]; Clough v. State (1878), 7 Neb. 320; 1 Wigmore on Evidence, § 118; Burrell on Circumstantial Evidence, 314. "The fact in this case that the person alleged to have been murdered was the wife of appellant presents a case outside of the ordinary. Therefore, under the circumstantial evidence upon the trial, the question would naturally arise: What motive, if any, prompted or induced appellant to commit the horrible crime of killing his wife? As well said by Chief Justice Hosmer in State v. Watkins (1831), 9 Conn. 47, 52: `The deceased was the wife of the prisoner. The presumption thence arising that she was not killed by her husband, or that it was not of malice aforethought, was powerful. The relation of husband and wife clearly implies a strong partiality, on the part of the husband, towards his wife, and the most ardent desire to protect her, and to render her happy. As a man will consult his own preservation and pursue his own interest; so, as a general truth, he will equally regard the protection and interest of his wife.'"
It is particularly true of the case at bar, as was said of the trial in Porter, supra, at page 705 of 173 Ind., at page 344 of 91 N.E.:
"It is manifest, therefore, in this case, that the existence or nonexistence of motive on the part of appellant to commit the crime charged was a question under the evidence to be considered by the jury; the former in favor of the state, and the latter in favor of the accused. There being evidence to support the theory advanced by appellant that there was an absence of motive, he was entitled to have the jury advised upon the law applicable to his theory by proper instructions. Banks v. State (1901), 157 Ind. 190, 60 N.E. 1087; Diehl v. State (1901), 157 Ind. 549, 62 N.E. 51; Eby v. State (1905), 165 Ind. 112, 74 N.E. 890; Brunaugh v. State (1910), 173 Ind. 483, 90 N.E. 1019.
"It follows, and we so conclude, that the court committed an error in refusing to charge as requested by appellant in respect to an absence or a lack of motive on his part for committing the crime in controversy."
One significant difference between Porter and the case at bar is that in Porter the trial court did give the jury some instruction on motive while here it gave none. Some of that instruction is more favorable to the State than to the defendant but the Porter court did not put its holding of error in refusing the defendant's instruction on that ground, implying only that the instruction given was too general to eliminate the necessity for giving the instruction tendered by defendant.
*853 Of course it is not every homicide case in which motive is an issue. In such cases the defendant is not entitled to a Porter type instruction. Evans v. State (1927), 199 Ind. 55, 155 N.E. 203, is an example. There the defendant had confessed and his confession stated the motive. In upholding the refusal of a tendered "motive" instruction (worded quite differently than the Porter type here in question) the court said:
"In Porter v. State (1910) 173 Ind. 694, 91 N.E. 340, where there was evidence introduced by the defendant that the killing was accidental and there was no evidence of any motive, it was held that he was entitled to an instruction that, if the evidence failed to show any motive for the alleged crime, such fact would be a circumstance which the jury should consider in determining its verdict. That case is quite different from the instant case, where the defendant's motive was shown by direct evidence." (Id. at 64, 155 N.E. at 206.)
Although there is some general language in Evans, including a quotation from a Missouri case, which seems to say that it would never be error to refuse an instruction of the Porter type in a Porter-like case it does not overrule Porter. Furthermore Miller v. State, supra, 223 Ind. 50, 58 N.E.2d 114, was handed down by the Supreme Court seventeen years after Evans. (Miller made the statement quoted, supra, indicating that an instruction like defendant's No. 3, supra, "would have been highly proper ... as an aid to the jury in its deliberations.")
The State's argument attempting to justify the trial court's refusal to give either of defendant's motive instructions includes the citation of Hinshaw v. State (1897), 147 Ind. 334, 47 N.E. 157, and Reynolds v. State (1897), 147 Ind. 3, 46 N.E. 31, in support of the often repeated statement proof of motive is not essential to a conviction. Neither of those cases involved the question of whether a motive instruction should have been given. In Reynolds the trial court refused to admit evidence that a defendant on trial for robbery owned twenty acres of land worth $800.00, evidence offered on the theory that it would show the absence of motive. The court's reason for approving the exclusion seems to be summed up by the statement that: "Men do not rob or steal except as they desire to do so; but such desire does not come so much from the poverty of the individual as from the absence of a moral sense, and desire to possess at all hazards something that does not belong to him." In sum, the proffered evidence did not tend to establish want of motive.
In Hinshaw the proof of appellant's guilt in the murder of his wife was circumstantial. In arguing that it was insufficient,
"appellant's learned counsel insist that one circumstance appearing in evidence is so inconsistent with all the other circumstances to which we have alluded that it leaves the matter of appellant's guilt at least in doubt, and that is, as they claim, the total absence of any adequate evidence for a reasonable motive in the appellant under the circumstances surrounding him to do the atrocious act of murdering his wife." (147 Ind. at 363, 47 N.E. at 166.)
Before recounting the evidence which indicated appellant's involvement with another woman which "fully justified [the jury] in inferring that appellant was actuated by a very natural motive, though extremely atrocious it was", the court quoted the following from Burrell Civ.Ev., p. 296:
"`Motives are made use of, like other evidentiary circumstances, not for their own sake, or from any view of speculative curiosity, but simply as means of arriving at the knowledge of an ultimate fact. They are resorted to as elements of evidence, not from any supposed necessity of accounting for, or explaining, the reason of a criminal act which has been [clearly] proven and fixed upon the accused, however strange or inexplicable *854 such act may in itself appear but from the important aid they always render in completing the proof of the commission of such act by the party charged, in cases where it might otherwise be thought to remain in doubt.'" (Id. at 364, 47 N.E. at 166.)
The question before us is not whether the State must prove motive in order to make a prima facie case, or whether proof of motive is indispensable to a conviction, but whether a defendant, in a case in which there is evidence that the killing was accidental and little or no evidence of motive, is entitled to an instruction that if the evidence fails to show motive that is a circumstance in defendant's favor which the jury should consider in making up its verdict.
The State's principal argument on this point is its quotation of the last sentence of 40 Am.Jur.2d, Homicide § 502, p. 755:
"Requests to charge that an absence of motive is a circumstance favoring innocence, or that such a circumstance affords a presumption of innocence, have been held improper and inapplicable in prosecutions for manslaughter, for the reason that malice is not a constituent factor of that type of homicide."
The only voluntary manslaughter case cited in support of that proposition is Crafford v. State (1925), 169 Ark. 225, 273 S.W. 13, 14, in which the defendant was charged with murder but was convicted of voluntary manslaughter. The court held that because voluntary manslaughter was distinguished from murder by the absence of malice "motive passed out of the case" with the manslaughter conviction. What the Arkansas court apparently failed to realize is that in voluntary manslaughter there is an intent, or purpose, to kill; that motive as an emotion exists in the "sudden heat", and motive as an external stimulus exists in the "adequate provocation", both of which are essential to the proof of voluntary manslaughter.
We believe the most pertinent and correct statement in the section of the encyclopedia (40 Am.Jur.2d Homicide § 502) cited by the State is this: "Many, and perhaps most, courts take the view that whether a motive instruction must be given depends upon the state of the record, and that where a live issue as to motive is presented to the jury by the evidence for either or both parties, the court should give, upon proper request, an instruction as to the necessity and effect of evidence of motive." (40 Am.Jur.2d p. 754.)
That state of the record existed when appellant made a proper request for an instruction which had been approved by the Supreme Court in the Miller case. The request was denied and defendant was convicted of a crime in which the motive is a sudden heat upon adequate provocation, of which there was no evidence. Whether the same result would have ensued had the instruction been given no one can say. We do not say that the giving of this instruction would have supplied every deficiency in the jury's instructions or that this instruction is the best instruction on the subject which could have been given. But no reason to refuse the instruction can be found in the fact that it is not a cure-all. That the instructions were otherwise deficient is more reason, not less reason, for giving this instruction. It was reversible error to refuse it.
The remaining issue is whether the trial court committed reversible error in sustaining the State's "Motion in Limine",[17] filed the day before the trial. *855 That motion asked the court "to admonish the witnesses and see [sic] counsel in this cause to refrain from referring to or commenting upon, directly or indirectly, in the presence of prospective jurors or in the presence of the jury selected to try this cause, in voire dire, opening statement, during the trial or in final argument, to the fact that the defendant herein was administered a private lie detector test during her detention in this cause, or the results of said test... ."[18] The reason stated was "[t]hat reference to such polygraph test, and the results thereof, are not admissible in evidence in this cause and any reference thereto would be highly prejudicial to the State in this case." Why such evidence was not admissible was not stated. No brief or memorandum of authorities was filed with or incorporated in the motion.
The court sustained the motion and admonished defendant and her attorney "to refrain in all ways from referring to, or in any way, directly or indirectly, commenting upon or referring to any lie detector test." The appellant has interpreted that ruling as precluding her "from ever placing the polygraph technician on the stand so that the Court could determine the admissibility." The State argues that the court's ruling was not that broad; that the technician could have testified out of the presence of the jury, but the appellant made no such attempt and made no offer to prove.
We have carefully searched the record and conclude therefrom that the State's contention is technically correct notwithstanding the colloquy between the trial judge and defense counsel just before defendant rested. Counsel could quite easily have understood what the court said at that time as being an order prohibiting such an offer. But in view of the flat ruling in Zupp v. State (1972), Ind., 283 N.E.2d 540, 543, 31 Ind.Dec. 219, 223, "that ... the results of a lie detector test [are] inadmissible" we doubt it makes any difference whether or not defendant made an offer to prove. Absent a waiver by the opposing party, it is the law that evidence of a polygraph test having been administered to a witness or a party is inadmissible.[19] However, it is the personal opinion of the writer that courts should not close their minds to the possibility that at some time in the history of the polygraph it may be possible to show that a qualified examiner, using proven techniques, can produce evidence of sufficient reliability that it may be heard by jurors (under proper cautionary instructions) without any greater risk that they will be mislead, or that their fact finding function will be *856 usurped, than the risk incurred in permitting experts in other fields to testify.[20] Perhaps the greatest risk is one common to many fields of expertise: How to judge whether an expert is qualified.[21]
In view of the state of the record and Zupp v. State, supra, (283 N.E.2d 540) we find no reversible error in the ruling on the motion in limine or in connection with the defendant's polygraph test. As already noted, it is for the error in refusing to read to the jury defendant's tendered instruction No. 2 that we reverse the trial court judgment with directions to grant the appellant a new trial to be conducted in conformity with the views expressed herein.
Reversed and remanded for new trial.
SULLIVAN, P.J., concurs with opinion in which BUCHANAN, J. joins.
SULLIVAN, Presiding Judge (concurring opinion in which BUCHANAN, J. joins).
I concur in the opinion of Judge White except insofar as its reference to Seats v. State (1970) 254 Ind. 457, 260 N.E.2d 796 implies that it is the duty of an appellate tribunal to gauge the sufficiency of circumstantial evidence by a standard which requires such evidence to "exclude every reasonable hypothesis of innocence."
It is my firm belief that the standard of appellate review is no different in cases in which the propriety of conviction rests upon circumstantial evidence than in those which involve direct evidence. As we stated in Guyton v. State (1973) Ind. App., 299 N.E.2d 233, 237:
"It is clear that a conviction may be sustained wholly upon circumstantial evidence so long as the evidence is of such probative value that a reasonable inference *857 of guilt may be drawn beyond a reasonable doubt. Gregory v. State (1972) Ind., 286 N.E.2d 666.
Guyton argues that the proper test for our review as to the sufficiency of circumstantial evidence is whether that evidence excludes every reasonable hypothesis of the innocence of the defendant. We recognize that many decisions both of the Court of Appeals and of our Supreme Court have used language seeming to require that a conviction upon circumstantial evidence, to be upheld upon appeal, must exclude very reasonable hypothesis of innocence.
Perhaps such phraseology would lead one to conclude erroneously that different standards exist for appellate review of convictions obtained upon direct evidence as opposed to those resting upon circumstantial evidence. Such is not the case. The sole test in reviewing any conviction is whether reasonable persons could conclude beyond a reasonable doubt that the defendant is guilty. To state the test conversely, a reviewing tribunal may not reverse a conviction upon `insufficiency of evidence' unless the appellate authority can say as a matter of law that reasonable persons, whether it be a jury or the trial court in a bench trial, could not from the circumstantial evidence draw reasonable inferences as to each material element of the crime so as to reach a conclusion of guilt beyond reasonable doubt."
It seems to me that this principle was and is compelled by decisions of the Indiana Supreme Court, e.g., McAfee v. State (1973) Ind., 291 N.E.2d 554; White v. State (1948) 226 Ind. 309, 79 N.E.2d 771. Furthermore, each of the three districts of the Court of Appeals have so held. Hardy v. State (1974 1st District) Ind. App., 307 N.E.2d 292; Guyton v. State (1973 2d District), supra, and Atkins v. State (1974 3rd District) Ind. App., 307 N.E.2d 73.
It is indeed unfortunate that the matter of appellate reviewability in this regard cannot be put to rest.
BUCHANAN, J., concurs.
NOTES
[1] The State has not questioned whether defendant properly and timely objected at trial or whether her motion to correct errors presents the alleged error with the requisite specificity.
[2] Carter v. State (1972), Ind. App., 291 N.E.2d 109, 112, 34 Ind.Dec. 533.
[3] Hash v. State (1972), Ind., 284 N.E.2d 770, 773, quoting Hobbs v. State (1969), 253 Ind. 195, 252 N.E.2d 498, 500, quoting Watford v. State (1957), 237 Ind. 10, 143 N.E.2d 405.
[4] Ind. Ann. Stat. § 10-3401 (Burns 1973 Supp.) IC 1971, XX-XX-X-X. The statute defines several other homicides which are first degree murder, but those definitions are not relevant to this discussion.
[5] Ind. Ann. Stat. § 10-3404 (Burns 1973 Supp.), IC 1971, XX-X-XX-X.
[6] Ind. Ann. Stat. § 10-3405 (Burns 1973 Supp.), IC 1971, XX-XX-X-X.
[7] In another fatal child abuse case, Hutchinson v. State (1967), 248 Ind. 226, 225 N.E.2d 828, the defendant was charged with, and found guilty of, second degree murder. Four judges concurred in an opinion which reversed with instructions to reduce the conviction to involuntary manslaughter. One judge dissented because he thought there was "sufficient evidence in the circumstances of the killing ... to allow the jury as a matter of law to imply malice and purpose", so he would affirm the second degree murder verdict. (Id. at 237, 225 N.E.2d at 834). The majority found to infer "either purpose or malice ... would not be reasonable". (Id. at 234, 225 N.E.2d at 833.) Neither the majority or the dissent mentioned voluntary manslaughter as a possibility, apparently because of the absence of any evidence of provocation or of sudden heat.
[8] Presently those statutes are Ind. Ann. Stat. §§ 9-1816 and 9-1817, Ind. Acts 1905, Ch. 169, §§ 271 and 272, now IC 1971, XX-X-XX-X and XX-X-XX-X.
[9] Including the defendant in Peats v. State (1938), 213 Ind. 560, 12 N.E.2d 270.
[10] Had the appellant pointed out that there was no evidence of a sufficient provocation or of a sudden heat caused thereby, the court probably would (and certainly should) not have characterized the appellant's objection to the evidence as being "too much, and not that it is too little". The court would have been more accurate had it said that the objection was that the evidence proved either too much (first degree murder) or too little (involuntary manslaughter) and wholly failed to prove an essential element of voluntary manslaughter  sudden heat.
[11] How could the driver of the approaching truck, through whose windshield the appellant threw a stone, from the automobile in which he was riding at seventy miles an hour, have possibly provoked a sudden heat in appellant?
[12] It is interesting to note that the Hash opinion's first degree murder example alludes only to "the additional element contained in the greater offense" (apparently without thought to the additional element of "sudden heat" essential to the lesser degree of voluntary manslaughter) and may be read as implying that if the jury declines to believe the act was with malice it is justified in handing up a verdict of voluntary manslaughter even though there is no evidence of provocation or of sudden heat. That implication may be proper and may be the law. Watford v. State (1957), 237 Ind. 10, 15, 143 N.E.2d 405, 407, held "that § 9-1816, supra [Ind. Ann. Stat. § 9-1816 (Burns 1956 Repl.)] applies only in those cases where the offense of lesser degree is necessarily included in the offense of greater degree charged in the affidavit or indictment." (Our emphasis.) (§ 9-1816 provides that, "[u]pon an indictment or affidavit for an offense consisting of different degrees, the jury may find the defendant not guilty of the degrees charged in the indictment or affidavit, and guilty of any degree inferior thereto... .") Watford involved an affidavit charging first degree burglary and the trial court's refusal to instruct the jury that it could find defendant guilty of third degree burglary. Its holding has been consistently followed with respect to burglary but has never been applied to homicide. Indeed, no Indiana homicide opinion seems ever to have considered whether voluntary manslaughter is truly a necessarily included offense under the Watford definition or whether it is is so treated merely because there is a "long line of judicial precedent" to that effect which the Supreme Court feels should not be upset. See Mimms v. State (1967), 249 Ind. 168, 172, 231 N.E.2d 151, and Barker v. State (1957), 238 Ind. 271, 276, 150 N.E.2d 680.
[13] The preliminary instructions correctly defined and stated the essential elements of each of the degrees of homicide covered by the indictment, i.e., second degree murder, voluntary manslaughter, and involuntary manslaughter and properly told the jury, in effect, that it could find defendant guilty of any one of those degrees only if each element thereof was proven to each juror beyond a reasonable doubt. Unfortunately (we believe) those instructions were not re-read to the jury as final instructions, but it was then told by final instruction No. 27, that defendant could "be found guilty of Murder or she may be found guilty of the lesser degree of homicide, to-wit: Manslaughter, or she may be found not guilty." It was also told that "if you find her guilty and have a reasonable doubt as to whether she is guilty of Murder in the Second Degree, or Manslaughter, then you should find her guilty of Manslaughter." In view of the evidence we believe that instruction would have been correct only if it had said "Involuntary Manslaughter" wherever it said Manslaughter. The jury was also instructed as to the proper forms of its verdict if it found the defendant guilty of second degree murder, voluntary manslaughter, involuntary manslaughter, or not guilty and they were furnished with such forms. Nothing in the final instructions told the jurors that they should not, or could not, properly find the defendant guilty of any particular degree of homicide covered by the indictment unless they found that each element of that particular offense had been proven beyond a reasonable doubt. Neither did the defendant request such an instruction nor did she object to any instruction given. Error, if any, has been waived.
[14] Cole v. State, supra, 192 Ind. 29, 134 N.E. 867.
[15] See note 7, page 845, which points out that neither the majority nor the dissent in Hutchinson spoke of a voluntary manslaughter verdict as a possibility. Hutchinon was also a child abuse case and the only reasonable explanation for its ignoring voluntary manslaughter as a possibility is that there was no evidence of a sudden heat motivated by an adequate or reasonable provocation.
[16] Professor Wigmore has much to say about how we confuse "motive" in its correct sense, which is a state of mind, with the external fact which may cause or incite motive. The essence of the distinction he makes is in the following sentences from his monumental work:

"It ought, therefore, to be clearly understood that the `motive', in the correct sense is the emotion supposed to have led to the act, and that the external fact is merely the possible existing cause of this `motive' and not identical with the `motive' itself... ."
Wigmore illustrates this distinction thus:
"For example, the prosecution of A by B in a suit at law may be said to have been a `motive' for A's subsequent burning of B's house. But in strictness the external fact of B's suit cannot be A's `motive'; for the motive is a state of mind of A; the external fact does tend to show the excitement of the hostile and vindictive emotion, but it is not identical with that emotion." 1 Wigmore, Evidence (3rd Ed., 1940), § 117, p. 558.
[17] "Literally, `in limine' means `On the threshold; at the outset.' Ballentine, Ballentine's Law Dictionary 628 (1969). See also 2 Burrill, Law Dictionary 55 (1871) and Callaghan, Cylopedic Law Dictionary 557 (1940). A `motion in limine' is a term used to describe a written motion which is usually made before or after the beginning of a jury trial for a protective order against prejudicial questions and statements. Its purpose has been succinctly expressed in Bridges v. City of Richardson (1962), 163 Tex. 292, 354 S.W.2d 366, 367:

`The purpose in filing a motion in limine to suppress evidence or to instruct opposing counsel not to offer it is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury with respect to matters which have no proper bearing on the issues in the case or on the rights of the parties to the suit. It is the prejudicial effect of the questions asked or statements made in connection with the offer of the evidence, not the prejudicial effect of the evidence itself, which a motion in limine is intended to reach... .'" Burrus v. Silhavy (1973) Ind. App., 293 N.E.2d 794, 796, 35 Ind.Dec. 541, 544.
[18] The prayer did not include the condition, "without first obtaining permission of the court outside the presence and hearing of the jury", which should be in every such prayer in order not to preclude proper offers of evidence during trial. Baldwin v. Inter City Contractors Service, Inc. (1973), Ind. App., 297 N.E.2d 831, 834, 37 Ind.Dec. 143, 147.
[19] Shortly after the Zupp ruling the Supreme Court held that it was not error for a trial court to admit, as rebuttal evidence after the defendant had testified, the testimony of a polygraph examiner who testified as to the results of a test taken by defendant pursuant to his own petition in which he had waived all objections to such evidence. Reid v. State (1972), Ind., 285 N.E.2d 279, 281, 32 Ind.Dec. 69, 72. The court did not say, as did the Supreme Court of Arizona in State v. Valdez (1962), 91 Ariz. 274, 371 P.2d 894, 900, that "polygraphic interrogation [while it] has not attained that degree of scientific acceptance ... to be admissible" absent waiver or stipulation "has been developed [since the decision in Frye v. United States (1923), 54 App.D.C. 46, 293 F. 1013, 34 A.L.R. 145] to a state in which its results are probative enough to warrant admissibility upon stipulation".
[20] most persons, as has always been popularly believed, lying and consciousness of guilt are accompanied by emotion or excitement that expresses itself in bodily changes,  the blush, the gasp, the quickened heartbeat, the clenched hand, the sweaty palm, the dry mouth... . This is part of the demeanor of the witness that the jury is told they may observe and consider upon credibility.
"Signs of internal stress accompanying deception are not always visible, and efforts have long been made to discover them in other ways. In the present century techniques for measuring and recording some of these bodily changes with instruments were developed and the appliance now commonly used is called a polygraph... .
* * * * *
"It seems to be conceded that the instrument does measure the information channels it is designed to monitor, namely the physiological changes. However, such changes can accompany internal stress having as its cause something other than conscious insincerity. The interpretation by the polograph examiner, not only of the charts, but of the questions and answers they accompany, and the total interview situation, is the critical factor in arriving at any opinion that when giving particular answers the subject was making a conscious effort to deceive. Clearly, nothing in the entire technique can show the underlying empirical truth in the sense of the facts occurring in the past; but only whether the person examined himself believed his answers." McCormick's Handbook of Evidence (2d Ed. 1972, § 207, p. 504-5 (Note omitted.)).
The same authority opines that the universal appellate level rejection of polygraph evidence (except for waiver or stipulation) rests not on the contention that "the opinion of a qualified expert in the field throws no light on ... whether relevant statements made by a party or witness were sincere or not ... [but] more upon a judicial estimate of the weight the trier of fact will give to that opinion and a demand that the opinion be almost infallible because the trier will think it so." Id. at 507.
[21] "As late as 1964, an authority in the field estimated that only about 20 percent of the persons operating as polygraph examiners were adequately qualified. Hearings, n. 93, supra at 8 (testimony of Prof. Inbau); cf. Bennett, A Penal Administrator Views the Polygraph, 24 Fed. Probation 40 (Dec. 1960) (six to twelve in the United States qualified). A few states have by statute provided for licensing and some standardization of qualifications of polygraph examiners. See Hearings, no. 93, supra, Pt. 1, at 123-132 (statutes from Illinois, Kentucky, New Mexico)." McCormick's Handbook of Evidence (2d Ed. 1972), § 207, p. 505, n. 2.